# In the United States Court of Appeals for the Eleventh Circuit

No. 21-13657

---

CITY OF SOUTH MIAMI, ET AL.,

*Appellees-Cross-Appellants,*

v.

GOVERNOR OF THE STATE OF FLORIDA, ET AL.,

*Appellants-Cross-Appellees.*

---

## INITIAL BRIEF OF APPELLANTS-CROSS-APPELLEES

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:19-CV-22927-BB

---

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
*henry.whitaker@myfloridalegal.com*

ASHLEY MOODY
*Attorney General*
HENRY C. WHITAKER
*Solicitor General*
DANIEL BELL
*Chief Deputy Solicitor General*
EVAN EZRAY
*Deputy Solicitor General*
JAMES H. PERCIVAL
*Deputy Attorney General*
NATALIE P. CHRISTMAS
*Assistant Attorney General*

No. 21-13657, *City of S. Miami, et al. v. Governor of the State of Florida et al.*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Appellants-Cross-Appellees certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Americans for Immigrant Justice, Inc., Appellee-Cross-Appellant

2. Bell, Daniel, Counsel for Appellants-Cross-Appellees

3. Bettinger-Lopez, Caroline, Counsel for Appellees-Cross-Appellants

4. Bloom, Judge Beth, Southern District of Florida

5. Brodeen, Karen Ann, Counsel for Appellants-Cross-Appellees

6. Chavez, Paul R., Counsel for Appellees-Cross-Appellants

7. Christmas, Natalie, Counsel for Appellants-Cross-Appellees

8. City of South Miami, Appellee-Cross-Appellant

9. DeSantis, Ron, Appellant-Cross-Appellee

10. Dwyer, Robert Kieran, Counsel for Appellees-Cross-Appellants

11. Ernst, Colleen Maher, Counsel for Appellants-Cross-Appellees

12. Ezray, Evan, Counsel for Appellants-Cross-Appellees

13. Family Action Network Movement, Inc., Appellee-Cross-Appellant

14. Farmworker Association of Florida, Inc., Appellee-Cross-Appellant

15. Florida Immigrant Coalition, Inc., Appellee-Cross-Appellant

16. Gonzalez, Mich, Counsel for Appellees-Cross-Appellants

17. Greer, Alana J., Counsel for Appellees-Cross-Appellants

18. Haskell, Miriam Fahsi, Counsel for Appellees-Cross-Appellants

19. Hernandez Anderson, Anne Janet, Counsel for Appellees-Cross-Appellant

No. 21-13657, *City of S. Miami, et al. v. Governor of the State of Florida et al.*

20. Hope Community Center, Inc., Appellee-Cross-Appellant

21. Londono, Oscar Hernan, Counsel for Appellees-Cross-Appellants

22. Louis, Lauren Fleischer, Southern District of Florida

23. Mesa-Estrada, Victoria, Counsel for Appellees-Cross-Appellants

24. Moody, Ashley, Appellant-Cross-Appellee

25. Patel, Anita J., Counsel for Appellants-Cross-Appellees

26. Percival, James, Counsel for Appellants-Cross-Appellees

27. QLatinx, Appellee-Cross-Appellant

28. Sharpless, Rebecca Ann, Counsel for Appellees-Cross-Appellants

29. Stoddard, Philip K., Appellee-Cross-Appellant

30. Teegen, Elizabeth Ann, Counsel for Appellants-Cross-Appellees

31. The Guatemalan-Maya Center, Inc., Appellee-Cross-Appellant

32. Throne, Barbara Jean, Counsel for Appellants-Cross-Appellees

33. WeCount!, Inc., Appellee-Cross-Appellant

34. Wenger, Edward Mark, Counsel for Appellants-Cross-Appellees

35. Westminster Presbyterian Church United of Gainesville, Florida, Inc., Appellee-Cross-Appellant

36. Whitaker, Henry, Counsel for Appellants-Cross-Appellees

*/s/ Evan Ezray*

## ORAL ARGUMENT STATEMENT

Appellants-Cross-Appellees respectfully submit that oral argument would aid the Court in resolving this appeal. The district court held a six-day trial, the complaint asserts 11 claims, and the district court made several significant errors.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION .................................................... 1

STATEMENT OF THE ISSUES ......................................................... 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE CASE ............................................................ 4

    I.   Factual Background ............................................................... 4

    II.  Procedural History ................................................................ 9

    III. Standard Of Review ............................................................ 11

SUMMARY OF ARGUMENT .......................................................... 12

ARGUMENT ..................................................................................... 15

    I.   Plaintiffs Lack Article III Standing. ..................................... 15

        A.  Plaintiffs cannot show traceability or redressability ........................................... 15

        B.  Plaintiffs did not prove a non-speculative injury traceable to the enforcement of SB 168 ........................................................................ 18

    II.  Plaintiffs Failed To Prove That The Florida Legislature Enacted SB 168 Based On Racial Animus ........................................................................ 21

        A.  The district court erred as a matter of law in concluding that SB 168 violated the Equal Protection Clause. ...................................................... 23

        B.  Plaintiffs failed to prove discriminatory purpose or effect. ............................ 29

    III. The Transport Provision Is Not Preempted. ....................................................... 44

CONCLUSION .................................................................................. 47

CERTIFICATE OF COMPLIANCE ................................................. 49

CERTIFICATE OF SERVICE ........................................................... 50

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ................................................................... 23, 24, 29, 34, 42

*Adams v. Sch. Bd. of St. Johns Cnty.,*
3 F.4th 1299 (11th Cir. 2021) ................................................................. 28

*Anderson v. Edwards,*
514 U.S. 143 (1995) ................................................................................ 45

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................... 3, 4, 39, 42, 45, 47

*Bandak v. Eli Lilly & Co. Ret. Plan,*
587 F.3d 798 (7th Cir. 2009) ................................................................. 42

*Bellitto v. Snipes,*
302 F. Supp. 3d 1335 (S.D. Fla. 2017) ....................................................... 42, 43

*Bose Corp. v. Consumers Union,*
466 U.S. 485 (1984) ................................................................................ 11

*Brnovich v. DNC,*
141 S. Ct. 2321 (2021) ........................................................................ 26, 37

*California v. Texas,*
141 S. Ct. 2104 (2021) ........................................................................ 15, 16

*City of El Cenizo v. Texas,*
890 F.3d 164 (5th Cir. 2018) ................................................................. 46

*City of L.A. v. Barr,*
929 F.3d 1163 (9th Cir. 2019) .............................................................. 30, 36

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................................ 19

*Clapper v. Amnesty International USA,*
568 U.S. 398 (2013) ..................................................................... 19, 20, 21

*Crawford v. Bd. of Educ. of City of L.A.,*
458 U.S. 527 (1982) ................................................................................ 25

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ................................................................................ 47

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................................... 10

*Demore v. Kim*,
  538 U.S. 510 (2003) ................................................................... 2, 4

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ............................... 27, 29, 30, 31, 34, 39, 40

*Easley v. Cromartie*,
  532 U.S. 234 (2001) ............................... 26, 29, 36, 37, 39, 43

*Estrada v. Becker*,
  917 F.3d 1298 (11th Cir. 2019) ........................................... 27

*Ex parte Young*,
  209 U.S. 123 (1908) ........................................................... 17

*Ga. Republican Party v. Sec. & Exch. Comm'n*,
  888 F.3d 1198 (11th Cir. 2018) ........................................... 18

*Ga. Republican Party, Inc. v. Sec'y of State for Ga.*, No.,
  2020 WL 7488181 (11th Cir. Dec. 21, 2020) ........................ 17

*Graham v. R.J. Reynolds Tobacco Co.*,
  857 F.3d 1169 (11th Cir. 2017) ........................................... 45

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ................ 22, 23, 25, 26, 27, 29, 33, 34, 36, 41, 44

*Hallmark Devs., Inc. v. Fulton Cnty.*,
  466 F.3d 1276 (11th Cir. 2006) ........................................... 28

*Hand v. Scott*,
  888 F.3d 1206 (11th Cir. 2018) ........................................... 33

*Hillman v. Maretta*,
  569 U.S. 483 (2013) ................................................... 45, 47

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ........................................................... 45

*Hoffman Plastic Compounds, Inc. v. N.L.R.B.*,
  535 U.S. 137 (2002) ........................................................... 38

*Int'l Refugee Assistance Project v. Trump*,
  883 F.3d 233 (4th Cir. 2018) ............................................. 40

*Jackson v. DeSantis*,
  268 So. 3d 662 (Fla. 2019) ................................................. 17

*Jacobson v. Fla. Sec'y of State,*
  974 F.3d 1236 (11th Cir. 2020) ...................................................... 12, 16, 17, 18

*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012) ............................................................................ 18

*League of Women Voters of Fla. v. Fla. Sec. of State,*
  --- F.4th ---, 2022 WL 1435597 (11th Cir. May 6, 2022) ........................ 24, 27

*Lewis v. Governor of Ala.,*
  944 F.3d 1287 (11th Cir. 2019) (en banc .................................................. 17, 18

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 15

*Lunn v. Commonwealth,*
  78 N.E.3d 1143 (Mass. 2017) ........................................................................ 8, 35

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013) ......................................................................... 28, 29

*Mass. Bd. of Retirement v. Murgia,*
  427 U.S. 307 (1976) ............................................................................................ 21

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ............................................................................................ 15

*McCleskey v. Kemp,*
  481 U.S. 279 (1987) ............................................................................................ 25

*Miller v. Johnson,*
  515 U.S. 900 (1995) ....................................................................................... 24, 30

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  138 S. Ct. 1461 (2018) ....................................................................................... 15

*N.C. State Conference of the NAACP v. Raymond,*
  981 F.3d 295 (4th Cir. 2020) ............................................................................. 24

*NAACP v. McCrory,*
  182 F. Supp. 3d 320 (M.D.N.C. 2016) ............................................................... 28

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
  142 S. Ct. 661 (2022) ........................................................................................... 3

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ........................................................................... 18

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No.,*
  551 U.S. 701 (2007) ............................................................................................ 41

*Personnel Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ..............................................................................22, 30

*Plyler v. Doe,*
    457 U.S. 202 (1982) ..............................................................................27, 38

*Price v. Austin Indep. Sch. Dist.,*
    945 F.2d 1307 (5th Cir. 1991) .................................................................. 40

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,*
    326 F.3d 1333 (11th Cir. 2003) ............................................................... 28

*Renteria-Marin v. Ag-Mart Produce, Inc.,*
    537 F.3d 1321 (11th Cir. 2008) ............................................................... 11

*Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for
    Equal. By Any Means Necessary (BAMN,*
    572 U.S. 291 (2014) ................................................................................. 25

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ................................................................................... 18

*Smith v. Doe,*
    538 U.S. 84 (2003) ..............................................................................25, 26

*Support Working Animals, Inc. v. Governor of Fla.,*
    8 F.4th 1198 (11th Cir. 2021) ..............................................................15, 16

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile,*
    980 F.3d 821 (11th Cir. 2020) ......................................................... 26, 37, 39

*United States v. Armstrong,*
    517 U.S. 456 (1996) ......................................................................... 25, 26, 31

*United States v. Bass,*
    536 U.S. 862 (2002) ................................................................................. 32

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ................................................................................. 38

*United States v. Hedaithy,*
    392 F.3d 580 (3d Cir. 2004) ..................................................................... 31

*United States v. Jordan,*
    635 F.3d 1181 (11th Cir. 2011) ............................................................... 31

*United States v. Marengo Cnty. Comm'n,*
    731 F.2d 1546 (11th Cir. 1984) ............................................................... 36

*United States v. O'Brien,*
    391 U.S. 367 (1968) ................................................................................. 27

*United States v. Olvis,*
 97 F.3d 739 (4th Cir. 1996) ........................................................................ 31

*United States v. Salerno,*
 481 U.S. 739 (1987) ..................................................................................... 45

*Veasey v. Abbott,*
 830 F.3d 216 (5th Cir. 2016) ................................................22, 25, 26, 39, 44

*Veasey v. Abbott,*
 888 F.3d 792 (5th Cir. 2018) ...................................................................... 23

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
 429 U.S. 252 (1977) ....................................................10, 21, 22, 28, 44

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011) ..................................................................................... 32

*Washington v. Davis,*
 426 U.S. 229 (1976) .............................................................................21, 24

*Whole Woman's Health v. Jackson,*
 141 S. Ct. 2494 (2021) ................................................................................. 15

*Wyeth v. Levine,*
 555 U.S. 555 (2009) ..................................................................................... 45

*Ziglar v. Abbasi,*
 137 S. Ct. 1843 (2017) ................................................................................. 38

Statutes

8 U.S.C. § 1357(g) ...............................................................................4, 6, 46
8 U.S.C. § 1373 .............................................................................................. 6
28 U.S.C. § 1291 ............................................................................................ 1
28 U.S.C. § 1331 ............................................................................................ 1
Art. III, § 3, Fla. Const. ............................................................................... 42
Art. IV, § 7, Fla. Const. ............................................................................... 17
Fla. Stat. § 908.101 .................................................................................5, 26, 29
Fla. Stat. § 908.102 .................................................................................6, 47
Fla. Stat. § 908.103 ....................................................................................... 6
Fla. Stat. § 908.104 ..........................................................................5, 6, 20, 44, 47

Fla. Stat. § 908.107 .................................................................................. 6, 16, 24

Fla. Stat. § 908.109 ................................................ 6, 20, 21, 23, 24, 29, 38, 44

Other Authorities

Br. for the United States, *United States v. Master*, No. 96-8373, 1997 WL 33543811
(11th Cir. Jan. 23, 1997) ................................................................................ 43

Br. of Amici Curiae Louisiana et al., *Trump v. New York*, No. 20-366, 2020 WL
6507263 (U.S. Oct. 30, 2020) ........................................................................ 43

Br. of Amici Curiae N.C. State Conference of the NAACP, et al., *Farm Lab. Organizing
Comm. v. Stein*, No. 21-1499, 2021 WL 5711664 (4th Cir. Nov. 24, 2021) ................ 43

Erin Dwinell, *Add Kansas to the Growing List of States Banning Sanctuary Cities* (Apr. 19,
2022) ............................................................................................................ 2

Hillel R. Smith, Cong. Rsch. Serv., LSB10375, *Immigration Detainers: Background and
Recent Legal Developments* (2020) ............................................................... 4, 5

William A. Kandel, Cong. Rsch. Serv., *Sanctuary Jurisdictions & Criminal Aliens: In Brief*
(2017) .......................................................................................................... 4

## STATEMENT OF JURISDICTION

Plaintiffs' suit invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court, however, lacked jurisdiction under Article III because Plaintiffs lack standing to sue. Defendants appealed the district court's final judgment under 28 U.S.C. § 1291. The court entered judgment on September 21, 2021, DE202, and Defendants filed a timely notice of appeal on October 19, 2021, DE205.

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs have Article III standing to challenge Florida's immigration-cooperation statute, Senate Bill 168 (SB 168).

2. Whether the district court erroneously concluded that two facially neutral provisions of SB 168 violate the Equal Protection Clause.

3. Whether the district court erroneously concluded that a third provision of SB 168, which facilitates transfers of those in custody by authorizing Florida officials to transport removable aliens to federal facilities, is preempted by federal law.

## INTRODUCTION

Like at least ten other states,[1] Florida has a law that requires state and local law enforcement officials to cooperate with federal immigration authorities when federal authorities request assistance in enforcing federal immigration law. That cooperation occurs almost exclusively in prisons and jails, where federal authorities seek to assume custody of removable criminal aliens upon their release from state or local custody. Such collaboration focuses immigration enforcement on aliens who have engaged in criminal activity, *see Demore v. Kim*, 538 U.S. 510, 513 (2003) (discussing Congress's finding that "deportable criminal aliens who are not detained continue to engage in crime"), and facilitates immigration arrests in safe, custodial settings, *see* Tr. Day 5 at 25–26 (testimony of Sheriff Robert Gualtieri).

Immediately after Florida enacted that law, *see* Fla. Stat. Ch. 908 (SB 168), Plaintiffs—the City of South Miami, its mayor, and several organizations—sued to stop it. After a bench trial, the district court concluded that two provisions of Florida's law were enacted by a Legislature motivated by unconstitutional racial animus and permanently enjoined the Governor and the Attorney General from enforcing the law. It also held that another provision—which allows state officials to transport people to

---

[1] *See* Erin Dwinell, *Add Kansas to the Growing List of States Banning Sanctuary Cities* (Apr. 19, 2022) https://www.heritage.org/immigration/commentary/add-kansas-the-growing-list-states-banning-sanctuary-cities.

federal detention facilities—was preempted, even though the United States said it was not.

That extraordinary judgment should be reversed. The record does not support the district court's remarkable conclusion that the Florida Legislature enacted SB 168 with a secret racist motive. The law promotes public safety in facilitating federal immigration enforcement against criminal aliens, while expressly prohibiting racial discrimination in its implementation. The district court found a hidden racist motive only by ignoring key provisions of the statute, failing to afford the Legislature a presumption of good faith, and placing great weight on the thinnest of evidence. The district court, for example, focused on the involvement in the legislative process of two organizations, whose work the Supreme Court has relied upon. *See Arizona v. United States*, 567 U.S. 387, 398 (2012). But whatever views those groups may hold, the district court seriously erred in imputing them to the two legislators who interacted with them and erred more egregiously still in using such evidence to impugn the motives of an entire sovereign state legislature.

"In our system of government," important policy choices are the "responsibility of those chosen by the people through democratic processes." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 666 (2022). The district court offered no sound basis for upsetting the policy judgment of the Florida Legislature here.

The judgment should be reversed.

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    *Federal immigration law and state cooperation*

States "bear[] many of the consequences of unlawful immigration," *Arizona*, 567 U.S. at 397, including costs associated with crimes committed by those who are unlawfully present, *e.g.*, *Demore*, 538 U.S. at 518. Accordingly, while state authority to enforce immigration law is limited, states may "cooperate with" federal authorities "in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10).

Virtually all of this cooperation occurs in state prisons or jails. Tr. Day 5 at 23–24. When a person is arrested and booked into custody, fingerprints are typically shared with other law enforcement agencies, including U.S. Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security. *See* William A. Kandel, Cong. Rsch. Serv., *Sanctuary Jurisdictions & Criminal Aliens: In Brief* 4 (2017).[2] If ICE has probable cause that the person is a removable alien, it will issue an immigration detainer, which asks a state or local law enforcement agency to notify ICE at least 48 hours before releasing the alien. DE199-8 at 6. After the alien's release, ICE will then take the alien into federal immigration custody to facilitate that alien's removal from the country. *See* Hillel R. Smith, Cong. Rsch. Serv., LSB10375, *Immigration*

---

[2]https://www.everycrsreport.com/files/20170110_R44118_fe15bcbb7ea9f8cffa4c69cfd3f650cff00cc6a7.pdf.

*Detainers: Background and Recent Legal Developments* 1 (2020).[3] Detainers are accompanied by an administrative immigration warrant, which authorizes up to 48 hours of detention beyond the scheduled release in case ICE cannot arrive in time. DE199-8 at 6, 13.

Most jurisdictions cooperate with these requests voluntarily. As Sheriff Gualtieri testified, the release of criminal aliens can result in "a danger to the community." Tr. Day 5 at 43. So-called "sanctuary" jurisdictions, however, refuse to provide that cooperation. DE199-8 at 2.

B.    *SB 168*

The Florida Legislature, like at least ten other state legislatures, has recognized an "important state interest to cooperate and assist the federal government in the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101. Consistent with that interest, in June 2019 the Legislature enacted SB 168, which requires this cooperation from state and local officials and entities.

Pertinent here, SB 168 contains four key provisions: the Best-Efforts Requirement, the Sanctuary Prohibition, the Transport Provision, and the Antidiscrimination Provision.

- The Best-Efforts Requirement, Fla. Stat. § 908.104(1), states that a "law enforcement agency shall use best efforts to support the enforcement of federal immigration law."

---

[3] https://sgp.fas.org/crs/homesec/LSB10375.pdf.

- The Sanctuary Provisions collectively prohibit state and local entities from adopting any "sanctuary policy," Fla. Stat. § 908.103, which is defined in § 908.102(6) as "a law, policy, practice, procedure, or custom . . . which prohibits or impedes a law enforcement agency from" (1) "complying with" the information-sharing requirements in 8 U.S.C. § 1373,[4] (2) "communicating or cooperating with a federal immigration agency" regarding detainers or requests for access to prisoners, or (3) entering into a cooperation agreement under 8 U.S.C. § 1357(g) (called 287(g) agreements).

- The Transport Provision, Fla. Stat. § 908.104(4), authorizes law enforcement, after receiving verification that a person subject to an immigration detainer is in their custody, to securely transport the person to a federal facility.

- The Anti-discrimination Provision prohibits state and local agencies and officials from basing "actions under this chapter on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution." Fla. Stat. § 908.109.

The Governor may either sue to enjoin state and local officials from violating SB 168 or use his other executive authority to ensure compliance. Fla. Stat. § 908.107(1). The Attorney General may sue to enjoin local government and law enforcement entities from violating the statute. Fla. Stat. § 908.107(2)–(3).

---

[4] Section 1373, in turn, provides that state and local officials "may not prohibit or in any way restrict" the sending of "information regarding the citizenship or immigration status . . . of any individual" to the federal government. 8 U.S.C. § 1373(a).

C.    *The enactment of SB 168*

In 2019, immigration cooperation between the state and the federal government became a legislative priority. DE192-16 at 3 (explaining that this "important and historic legislation" was "a long time coming").

During the 2019 legislative session, which ran from March to May, Florida officials met with a variety of stakeholders, including an organization called Floridians for Immigration Enforcement (FLIMEN). FLIMEN is not affiliated with the Federation for American Immigration Reform (FAIR) or Center for Immigration Studies (CIS)—which Plaintiffs allege are "hate groups"—but some of its members are affiliated with those groups. DE201 at 11; Tr. Day 2 at 191–92. During the session, members of FLIMEN met with employees of the Governor's Office, the Attorney General's Office, and a few legislators and legislative staff. Tr. Day 2 at 194–96, 221–25; Tr. Day 4 at 145, 151–52; DE199-23. One of Senator Gruters' staffers, Josh Barnhill, communicated with members of FLIMEN several times, and agreed to introduce a few bills that FLIMEN had drafted. DE191-5; DE191-6; DE191-7; DE191-9; DE191-11; DE191-13. SB 168, however, was not one of those bills. DE191-7; Tr. Day 2 at 192.

Those meetings were nothing special. The district court heard testimony that Florida officials will generally endeavor to meet with anyone who asks. Tr. Day 2 at 218; Tr. Day 4 at 151. And virtually every witness in this case—either themselves or

7

through their organizations—was able to obtain meetings with legislators during the 2019 legislative session. DE201 at 22, 28, 32–33, 34, 38, 39, 41, 56.

Sheriff Gualtieri, the President of the Florida Sheriffs' Association, also met with members of the Legislature. He explained that when a removeable alien has committed a crime, many sheriffs want to cooperate with federal immigration officials to avoid releasing that offender back into the community. Tr. Day 5 at 18. Historically, sheriffs did so by honoring federal detainers. Tr. Day 5 at 16. But some court decisions had complicated that process, Tr. Day 5 at 16–17, leaving sheriffs in an "untenable position." Tr. Day 5 at 17; *see, e.g.*, *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1154–58 (Mass. 2017) (holding that Massachusetts officials lack the power under state law to effectuate federal immigration enforcement absent additional authority granted by its legislature). To solve that problem, local law enforcement needed a "solution from the Florida Legislature" making clear that they could cooperate with federal immigration officials. Tr. Day 5 at 43.

During the legislative process, Senate staff prepared a report on the bill. Part of that report included data from FAIR and CIS. DE192-4 at 4. While the report cited this information, it did not endorse it. *See* DE192-4 at 4 (recommending a more "objective" approach than the FAIR and CIS data). After certain legislators expressed concern with the use of this information, Senator Gruters stated that he was not aware that these groups held problematic views, and that "any type of discrimination in any form is wrong." Tr. Day 2 at 184; DE199-20 at 1:27:48–1:30:00.

Towards the end of the legislative session, a few members of the Legislature participated in an event called "Victims of Illegal Immigration Day," in which private citizens, including a representative from FLIMEN, were permitted to speak regarding their experiences. DE192-16. A mother and father discussed their son, who was killed by an individual who had twice been removed by federal authorities. DE192-16 at 6–9. Another woman spoke about her difficult childhood in Nicaragua and her experience lawfully immigrating to the United States. DE192-16 at 10–11. She warned that "victimizers" like the ones she experienced in Nicaragua seek to harm people regardless of their immigration status and that some of these "victimizers . . . will kill you." DE192-16 at 11. The participants expressed support for SB 168. DE192-16. The House and Senate sponsors also spoke. DE192-16. Senator Gruters explained his view that the bill was "about respecting the rule of law," "cooperating with the Federal Government," and "public safety." DE192-16 at 3–4. Representative Byrd shared those sentiments, explaining that the bill was about "public safety," and was "not anti-immigrant." DE192-16 at 4.

SB 168 ultimately was passed with a vote of 68-45 in the House and 22-18 in the Senate. DE199-13; DE199-14.

## II.    Procedural History

Days after SB 168 went into effect, Plaintiffs sued to enjoin the Governor and the Attorney General from enforcing it. DE1; DE38. They alleged that the Transport Provision was preempted by federal law, that the Best-Efforts Provision and the

9

Sanctuary Prohibition were unconstitutionally vague and violated the Equal Protection Clause. Citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), Plaintiffs argued that SB 168, though race neutral on its face (except for the provision that prohibits racial discrimination), was nonetheless unconstitutional because it was motivated by secret racial animus. DE38 at 70, 73.

Plaintiffs moved for a preliminary injunction on their preemption and vagueness claims. DE5; DE47. The district court denied that motion as to every provision except the Transportation Requirement, which the court held was likely conflict preempted. DE64 at 43–45. The district court next considered Defendants' motion to dismiss; it dismissed the vagueness claims but permitted the preemption and equal protection claims to move forward. DE83.

During discovery, Plaintiffs produced an expert report from Dr. Lichtman. DE191-1. The report explains that Dr. Lichtman was "asked by Plaintiffs' counsel . . . [to] offer [his] opinions on whether" SB 168 "was adopted with the intent of discriminating against minorities." *Id.* at 5. Defendants filed a motion invoking *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude Dr. Lichtman, which was granted in part. The court concluded that Dr. Lichtman should be "precluded from offering any opinions at trial as to the ultimate issue of discriminatory legislative intent." DE157 at 25. The court, however, allowed Dr. Lichtman to testify as to each factor considered in the Supreme Court's decision in *Arlington Heights*, so long

as he did not state his ultimate conclusion on whether the Legislature had an unconstitutional motive. DE201 at 49–55.

Both sides moved for summary judgment. The district court granted summary judgment for Plaintiffs on the Transportation Provision and denied cross motions on the equal-protection claims of racial animus. DE164.

The case proceeded to a bench trial on the equal-protection claims, after which the court concluded that Plaintiffs had "met their burden of establishing that the Best-Efforts Provision and the Sanctuary Prohibition violate the Equal Protection Clause," and therefore, permanently enjoined the Governor and the Attorney General from enforcing them. DE201.

Defendants appealed that judgment. Plaintiffs have cross appealed the dismissal of their other claims.

## III.    Standard Of Review

This Court reviews conclusions of law de novo and findings of fact for clear error. *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008). Review for clear error "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 501 (1984).

## SUMMARY OF ARGUMENT

1. Plaintiffs lack standing to sue the Governor and the Attorney General, the only named defendants. Plaintiffs claim injury principally from supposed racial profiling and other discriminatory law enforcement practices. But those alleged injuries have little to do with the Governor or the Attorney General, who do not conduct such law enforcement activities and have at best attenuated supervisory authority over officials who do. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020). Still less do those injuries stem from Florida's immigration-cooperation law, which principally operates in prisons and jails and has nothing to do with racial profiling. Plaintiffs also failed to prove that they suffered an injury in fact by diverting resources away from their core missions—rather than simply spending resources to carry out their missions—and failed to show that their members have been harmed by SB 168.

2. On the merits of the claim of racial animus, the district court committed numerous errors to arrive at the remarkable conclusion that the Florida Legislature had secret racist motivations in enacting SB 168.

Initially, the district court ignored SB 168's anti-discrimination provision. That infected both the discriminatory effect and intent findings. On effect, the district court never explained how, and cited no competent evidence that, a law that prohibits discrimination would somehow increase discrimination. And on intent, the fact that the Legislature included an enforceable prohibition on discrimination in the law powerfully refutes any claim of discrimination.

The district court also failed to afford the Legislature a presumption of good faith. That presumption, with taproots in the states' status as sovereigns, is the necessary starting point in a discriminatory-intent case. But the district court never even uttered the words "presumption of good faith" and, instead of drawing inferences in favor of the Legislature, consistently inferred nefarious intent based on the thinnest of evidence.

The district court also inferred that the Legislature's stated purpose—to improve public safety through facilitating cooperation with federal immigration authorities—was pretextual by relying on dubious evidence and effectively second-guessing the wisdom of the Legislature's policy judgment. The Supreme Court, however, has consistently said that only the clearest evidence should be used to look behind a Legislature's stated purpose.

The evidence the district court did rely on was woefully insufficient to show racial discrimination. The district court used evidence about a few legislators to discern the full Legislature's intent, impermissibly relied on statements of non-decisionmakers, confused statements about unauthorized immigrants with statements about race, and relied on an expert's ultimate assessment of legislative purpose—even though the expert's methodology was squarely inconsistent with controlling precedent.

Even apart from those errors, the district court clearly erred in finding discriminatory purpose. The Legislature's purpose was plainly to promote public safety through facilitating federal immigration enforcement against criminal aliens, and the Legislature included a provision in the law prohibiting discrimination in its

13

implementation. The contrary narrative endorsed by the district court relied on the involvement of a handful of advocacy groups in the legislative process, based principally on the district court's characterization of these groups as "hate groups." Even on the district court's own account, those groups influenced at most two legislative sponsors of the bills, who themselves expressly disavowed any racist motives. The district court then magnified that error by, in turn, attributing the views of those two legislators to the Legislature as a whole. The district court also repeatedly conflated a motive to facilitate federal immigration enforcement against criminal aliens with a motive to harm racial minorities. And the district court mistakenly concluded that SB 168 would somehow increase racial profiling—despite the fact that the law operates in jails and prisons and has no effect on street-level police tactics that might lead to racial profiling.

3. The district court also erred in finding the Transport Provision preempted. Contrary to the district court's view, that provision does not authorize unilateral enforcement of immigration law by state authorities. It instead permits state officials to assist in carrying out immigration-enforcement decisions made by federal officials. Such cooperation is perfectly consistent with federal law, which expressly contemplates that states may assist with enforcing federal immigration law even without a formal agreement contemplating such assistance.

14

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing.

To bring their claims, Plaintiffs needed to establish all three elements of Article III standing: injury in fact, traceability, and redressability. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1200 (11th Cir. 2021). They established none.

#### A.    *Plaintiffs cannot show traceability or redressability.*

Plaintiffs must prove they have incurred an injury that is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotations and alterations omitted). Plaintiffs must also prove that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (quotations omitted). The district court dealt with those two elements in a sentence, reasoning that Plaintiffs' purported injuries "arise directly from SB 168 and can be redressed by enjoining the challenged provisions." DE201 at 61. That was error.

"[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021); *accord Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). That comes from black-letter remedies law: Remedies operate on "specific part[ies]," they "do not simply operate 'on legal rules in the abstract.'" *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1486 (2018) (Thomas, J., concurring)). And thus, to show traceability and redressability, a plaintiff must point

15

to a defendant who enforces the law and propose relief the defendant can be ordered to give that will redress the plaintiff's injury. *See id.* at 2116; *see also Support Working Animals*, 8 F.4th at 1201. Here, however, the only defendants are the Governor and the Attorney General, *see* DE38 at 23–25, and none of Plaintiffs' injuries are traceable to them or would be redressed by enjoining them from enforcing SB 168.

The harms Plaintiffs assert flow from the alleged actions of law enforcement officers not before this Court, not from the Attorney General or the Governor. Plaintiffs point to the fact that Defendants are empowered to "initiate judicial proceedings in the name of the state against" officers or entities that fail to comply with SB 168. Fla. Stat. § 908.107(1); *see* DE38 at 24–25. But that provision gives Defendants no power to enforce a *court injunction* against SB 168 itself. On the contrary, that provision, which specially authorizes Defendants to enforce SB 168 against local officials and governments by filing a lawsuit, underscores that Defendants otherwise lack supervisory authority under Florida law over those officials, who are the ones Plaintiffs assert are injuring them. *See Jacobson*, 974 F.3d at 1254 ("That the Secretary must resort to coercive judicial process if the Supervisors fail to perform their duties underscores her lack of authority over them.").

*Jacobson* is on point here. There, this Court held that plaintiffs lacked standing to sue the Florida Secretary of State on a claim that the order of candidates on Florida's election ballot was unlawful. *Id.* at 1253. The Court explained that, under Florida law, only supervisors of elections had authority to determine the order of names on the

16

ballot, not the Secretary of State, and that those supervisors "are independent officials under Florida law who are not subject to the Secretary's control." *Id.* As a result, any injury suffered by plaintiffs was not redressable by an injunction against the Secretary or traceable to her conduct. *Id.* at 1254.

Here, as in *Jacobson*, the relevant officers in Florida—state and local line law enforcement officials, such as local sheriffs—have an independent obligation to follow SB 168. *Id.* at 1255 (explaining that non-party officers "are obliged under state law to continue" the challenged conduct "regardless of what a federal court might say in an action that does not involve them"); *Ga. Republican Party, Inc. v. Sec'y of State for Ga.*, No. 20-14741, 2020 WL 7488181, at *2 (11th Cir. Dec. 21, 2020) (court cannot "order a nonparty county official to do something contrary to state law"). And although the Governor can suspend "county officer[s]" for "malfeasance, misfeasance, [or] neglect of duty," Art. IV, § 7(a), Fla. Const., that authority is entirely discretionary. *See Jackson v. DeSantis*, 268 So. 3d 662, 663 (Fla. 2019); *Ex parte Young*, 209 U.S. 123, 158 (1908) ("There is no doubt that the court cannot control the exercise of the discretion of an officer."). The speculative possibility that he might exercise such authority in response to the district court's injunction—and that the Florida Senate would not override any such suspension, Art. IV, § 7(b), Fla. Const.—cannot support standing. Still less does the Attorney General's generalized authority to litigate for the state and status as its "chief legal officer," *id.* § 4(b), confer standing to sue her. *See Lewis v. Governor of Ala.*,

17

944 F.3d 1287, 1300–01 (11th Cir. 2019) (en banc) (same regarding the Alabama Attorney General).

B.    *Plaintiffs did not prove a non-speculative injury traceable to the enforcement of SB 168*

The district court erred in concluding that Plaintiffs face a non-speculative injury in fact that is traceable to SB 168.

1. The district court concluded that the organizations had suffered an injury because they had "diver[ted] resources from their core missions . . . to address SB 168." DE201 at 60. But demonstrating a diversion of resources requires an organization to show what it diverted "resources away from." *Jacobson*, 974 F.3d at 1250 (emphasis omitted). An organization "cannot convert its ordinary program costs into an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). Instead, the Plaintiff organizations must show that the law required the expenditure of resources in a way that kept them from "pursuing [their] true purpose." *Id.*; *see also Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018) (asking whether the "diversion impairs" the organization). That makes sense—if an organization's decision "to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury" that would "imply standing for organizations with merely 'abstract concern[s] with a subject.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Here, Plaintiffs failed to show a sufficient diversion.[5] On the contrary, addressing the effect of laws like SB 168, educating the community, and the like, *see* DE201 at 60, were the "core missions" of the organizational plaintiffs. *E.g.*, Tr. Day 1 at 63 (testimony that organization fought numerous "defensive battles" against laws like SB 168); *id.* at 98 (organization existed to provide "free direct legal services" and "policy advocacy work"). Thus, the spending identified by the district court concerned mine-run matters: that the organizations hosted meetings, provided support to their communities, hosted food banks, and the like. DE201 at 60. That is their day-to-day work, DE201 at 9–10, not a diversion of resources away from their work.

2. The district court next found that the "member-based organizations" can challenge SB 168 on behalf of members who have "suffered injuries from racial and ethnic profiling," DE201 at 61, and fear such injuries in the future. Racial and ethnic profiling are no doubt injuries. But because Plaintiffs sought only prospective injunctive relief, they cannot rely on past injuries to establish standing. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

As for their asserted future injuries, Plaintiffs rely upon the same kind of speculation rejected by the Supreme Court in *Clapper v. Amnesty International USA*, 568 U.S. 398, 412–13 (2013), as a basis for standing. There, the Supreme Court held that the plaintiffs lacked standing to sue based on their speculative fear that they would be

---

[5] The parties stipulated that "Plaintiffs diverted resources in response to SB 168." DE161 at 5. But the parties did not—and could not—stipulate that such a diversion was sufficient to establish standing.

subject to surveillance by the federal government, in part because the plaintiffs had not demonstrated that any such surveillance (were it to occur at all) would stem from the law that the plaintiffs had challenged, or some other law. 568 U.S. at 412.

So too here. The district court offered nothing to connect Plaintiffs' fears of future profiling and other discriminatory conduct to SB 168. That law in fact prohibits racial discrimination. Fla. Stat. § 908.109. Nor, contrary to the district court's repeated characterizations, is SB 168 a "proactive police measure," DE201 at 49, 50, 55, 68–69, 71, 72, 74, 82, connected to racial profiling that may occur on the ground. Instead, it authorizes cooperation between state and local law enforcement agencies in carrying out immigration-enforcement decisions made in the first instance by the federal government, such as in response to detainer requests made by ICE. *See* Fla. Stat. § 908.104 (requiring state and local officials to "support the enforcement of federal immigration law"); Tr. Day 5 at 24 (SB 168 "has nothing to do with police officers . . . who are in patrol function or law enforcement function. This is exclusively—and the only time you're touched by this is if you are in a county jail, period."). The district court's assumption that SB 168 caused profiling was unsupported by the evidence. *E.g.*, Tr. Day 1 at 89 (organizational witness admits that she didn't know the race of the people she claimed were racially profiled); Tr. Day 1 at 165 (anecdotal evidence that occurred before SB 168's effective date); Tr. Day 2 at 49 (organization had no firsthand knowledge of why stop occurred). In the end, because Plaintiffs "can only speculate as to whether any (asserted)" profiling "would be under"

20

SB 168 "or some other" law, "they cannot satisfy the 'fairly traceable' requirement." *Clapper*, 568 U.S. at 413.

The district court also pointed to fears expressed by Plaintiffs' members that they might face discriminatory enforcement, which have caused those members to refrain from accessing services. DE201 at 61. But Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 415. If anything, Plaintiffs' assertions are on worse footing than in *Clapper*. The *Clapper* plaintiffs' theory was speculative because the statute they challenged, "at most authorize[d]—but d[id] not mandate or direct—the surveillance that" they feared. *Id.* at 412 (emphasis omitted). Here, again, SB 168 affirmatively prohibits discrimination. *See* Fla. Stat. § 908.109.

## II.   Plaintiffs Failed To Prove That The Florida Legislature Enacted SB 168 Based On Racial Animus.

Under the Equal Protection Clause, laws that facially discriminate against a suspect class are subject to strict scrutiny, *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976), while other laws are generally subject to rational-basis review, *Washington v. Davis*, 426 U.S. 229, 246–47 (1976). But a facially neutral law with discriminatory purpose and effect might also be subject to strict scrutiny. *See Arlington Heights*, 429 U.S. at 265. Because SB 168 is facially neutral, Plaintiffs invoke *Arlington Heights* in contending that the Florida Legislature enacted SB 168 with racial bias. *See* DE83 at 48.

In applying *Arlington Heights*, courts consider several factors: (1) the existence of a discriminatory effect; (2) contemporary statements and actions of key legislators; (3) the historical background of the law; (4) the specific sequence of events leading up to the law's passage, including procedural and substantive departures from the norm; (5) the existence of a foreseeable disparate impact and the Legislature's knowledge of it; and (6) the availability of less discriminatory alternatives. *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1322–28 (11th Cir. 2021). "If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Id.* at 1321.

The showing Plaintiffs must make is exceedingly high. So high, in fact, that for nearly 40 years no court found that a state legislature acted with discriminatory intent in a case based on circumstantial evidence like this one. *See Veasey v. Abbott*, 830 F.3d 216, 286 (5th Cir. 2016) (en banc) (Jones, J., dissenting). Indeed, Plaintiffs must show that the Legislature enacted SB 168 "in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). And as this Court recently recognized, "determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham Ministries*, 992 F.3d at 1324.

Plaintiffs fell far short of clearing that high hurdle. The district court's contrary conclusion is shot through with legal error and wrongly imputed a nefarious discriminatory purpose to the Florida Legislature in enacting SB 168.

A.    *The district court erred as a matter of law in concluding that SB 168 violated the Equal Protection Clause.*

1. The district court erred by failing to consider SB 168's full scope in assessing discriminatory effect. *See Greater Birmingham Ministries*, 992 F.3d at 1321 (asking whether the "challenged *law* has a discriminatory impact" (emphasis added)). The district court found that historically "discriminatory police practices" have been used in Florida and concluded that "those discriminatory practices are aggravated by the proactive police measures of SB 168." DE201 at 68–69. But again, SB 168 is not a "proactive police measure," *see supra* p. 20; and even if it were, it prohibits racially discriminatory practices. Fla. Stat. § 908.109. Thus, the district court's conclusion about "Florida law enforcement's historical pattern of racial discrimination," DE201 at 69, is simply inapplicable to analyzing *this* law's effects. *Cf. Veasey v. Abbott*, 888 F.3d 792, 802–03 (5th Cir. 2018) (concluding that at remedial phase of an equal-protection case a district court needed to consider legislation designed to remedy alleged discrimination).

By ignoring this law's prohibition on discrimination, the district court erroneously allowed "[p]ast discrimination . . . in the manner of original sin" to "condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (quotation omitted). Indeed, there is no indication that Plaintiffs ever attempted to invoke SB 168's antidiscrimination provisions to remedy their alleged injuries. And so, there is no evidence that this law, which prohibits discrimination, actually increases it.

23

2. The district court next erred by giving no weight to the presumption of legislative good faith. *See Abbott*, 138 S. Ct. at 2325; *League of Women Voters of Fla. v. Fla. Sec. of State*, --- F.4th ---, No. 22-11142, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022) (per curiam). "Although race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citation omitted). Thus, in assessing discriminatory purpose, "the district court *must* afford the state legislature a 'presumption' of good faith." *N.C. State Conference of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020). But the district court never did. The words "legislative good faith" do not appear in its decision. And instead of drawing inferences in favor of the Legislature, it consistently drew them the other way. *See League of Women Voters*, 2022 WL 1435597, at *5.

Most glaringly, by failing to accord the Legislature deference, the district court overlooked the most obvious evidence that the Legislature had a valid purpose: The Legislature specifically prohibited discrimination and created new enforcement mechanisms to back up that prohibition. Fla. Stat. §§ 908.107, 908.109. The district court never explained why a Legislature bent on racial discrimination would prohibit discrimination.

It would not. As both the Supreme Court and this Court have explained, provisions designed to eliminate discrimination are powerful evidence that the Legislature lacked a discriminatory purpose. *Washington*, 426 U.S. at 246 (concluding

that police department's "affirmative efforts" to combat discrimination "negated any inference" of discriminatory intent); *Greater Birmingham Ministries*, 992 F.3d at 1324 ("Alabama specifically . . . offers free photo IDs . . . which raises the question: . . . 'why would a racially biased legislature have provided for a cost-free election ID card to assist . . . voters [] of all races?" (quoting *Veasy*, 830 F.3d at 281 (Jones, J., dissenting))); *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291, 331–32 (2014) (Scalia, J., concurring) ("[A]ny law expressly requiring state actors to afford all persons equal protection of the laws . . . does not—*cannot*—deny to any person . . . equal protection of the laws . . . regardless of whatever evidence of seemingly foul purposes plaintiffs may cook up[.]" (internal citations and quotation marks omitted)); *cf. Crawford v. Bd. of Educ. of City of L.A.*, 458 U.S. 527, 544 (1982) (valid purpose indicated by the fact that a state enactment did not "limit the power of state courts to remedy the effects of intentional" discrimination).

3. The district court also failed to demand the most compelling evidence to second guess SB 168's stated purpose; instead, finding discriminatory purpose based on a daisy-chain of inferences from thin circumstantial evidence. The Supreme Court has held that when "there [a]re legitimate reasons for the . . . Legislature to adopt and maintain" a law, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298–99 (1987). Accordingly, courts should "ordinarily defer to the legislature's stated intent," and "only the clearest proof will suffice to override" that consideration. *Smith v. Doe*, 538 U.S. 84, 92 (2003); *see also United States v. Armstrong*, 517 U.S. 456, 464–

65 (1996) (demanding clear evidence to overcome presumption of regularity). That demanding evidentiary standard is why the Supreme Court has reversed discriminatory intent findings even when they were supported by "a modicum of evidence." *Easley v. Cromartie*, 532 U.S. 234, 257 (2001).

Here, however, SB 168 has a legitimate purpose: "to cooperate and assist the federal government in the enforcement of federal immigration laws." Fla. Stat. § 908.101. In considering whether that stated purpose was pretextual, the district court should have confined itself to only the clearest evidence.

4. Relatedly, the district court committed legal error by relying on inherently suspect evidence. *See Veasey*, 830 F.3d at 231 (plurality op.) (reversing discriminatory purpose finding when the district judge relied on "infirm" evidence). It did so in many ways.

*First*, the district court pointed to no evidence regarding the intent of the full Florida Legislature, which is the "legally dispositive intent." *Greater Birmingham Ministries*, 992 F.3d at 1325. Instead, the district court pointed to statements and actions of private citizens and a few isolated legislators. *E.g.*, DE201 at 89 (discussing Senator Gruters, Representative Byrd, and statements by citizens); *id.* at 93 (citing Senator Gruters and Representative Byrd). As to the statements and actions of private citizens, they have "no application" to this case because "legislators who vote to adopt a bill are not the agents of the bill's . . . proponents." *Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021); *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 836 (11th Cir. 2020). The same

26

is true with respect to isolated legislators. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it," *United States v. O'Brien*, 391 U.S. 367, 384 (1968), and even "[t]he vote of a sponsor is only one vote" among many, *Greater Birmingham Ministries*, 992 F.3d at 1324. When those points are coupled with "the presumption of legislative good faith," courts cannot "fairly read" the statement of a "single legislator" to "demonstrate discriminatory intent by the state legislature." *League of Women Voters*, 2022 WL 1435597, at *5.

*Second*, much of the evidence the district court relied on is not about SB 168. *E.g.*, DE201 at 81 (focusing on Governor DeSantis' campaign ads and FLIMEN's old marketing materials). Indeed, the district court considered a sign Senator Gruters posted in his lobby to be the "most notabl[e]" piece of contemporaneous evidence. DE201 at 93. But the sign, which showed people who had been deported from Sarasota County, was "made in [an] unrelated context[]" and thus "do[es] not qualify as [a] 'contemporary statement[]' probative of the decision at issue." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020).

*Third*, the district court repeatedly mistook a motive to enforce the law against federal-immigration violators for racial animus. *E.g.*, DE201 at 90–92 (finding racial animus because Representative Byrd said that "a 13-year old girl in Pasco County . . . was killed by an illegal immigrant"). But "undocumented aliens" are not a "suspect class." *Estrada v. Becker*, 917 F.3d 1298, 1308–09 & n.13 (11th Cir. 2019) (citing *Phyler v. Doe*, 457 U.S. 202, 223 (1982)). The district court's "misunderstanding of the

classification at issue infected its constitutional inquiry." *See Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1332 (11th Cir. 2021) (Pryor, C.J., dissenting), *vacated and reh'g en banc granted*, 9 F.4th 1369 (11th Cir. 2021); *see also Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1284 (11th Cir. 2006) (statements at issue "do not demonstrate racial animus[,] [t]hey demonstrate class animus").

*Fourth*, the district court erred twice over in relying on Dr. Lichtman's testimony—it was an error to admit any of the testimony and relying on it was even worse.

Rule 702 requires the trial court to "serve as a gatekeeper to the admission of" expert evidence. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003). But Dr. Lichtman's testimony was a closing argument masquerading as expert analysis. He summarized arrest data, opined on the motivation of legislators, and discussed legislative purpose. The district court recognized that ultimate-purpose testimony was improper, DE157 at 25, but essentially sanctioned that exact testimony by permitting Dr. Lichtman to opine on legislative intent and "how the *Arlington Heights* analysis, (or [his] variant of it) ought to be performed." *NAACP v. McCrory*, 182 F. Supp. 3d 320, 494 (M.D.N.C. 2016), *rev'd on other grounds* 831 F.3d 204 (4th Cir. 2016).

In any event, Dr. Lichtman had no reliable methodology. He identified his methodology as the *Arlington Heights* test. DE191-1 at 5–6. What he meant, apparently, is that he gathered hearsay statements and used them to "speculate as to the motivations and intentions of" the Legislature. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d

Cir. 2013) (affirming exclusion of history expert who used a similar methodology). And even if that were proper, Dr. Lichtman did not follow that methodology in a reliable way. To name just few problems: he looked to long-past history; DE191-1 at 23–44; *but see Abbott*, 138 S. Ct. at 2324 (that is improper); he looked to the intent of non-lawmakers, DE-191-1 at 185, 208; *but see Greater Birmingham Ministries*, 992 F.3d at 1325 (also improper); he looked to remote-in-time statements by non-decisionmakers, DE191-1 at 130–31; *but see Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (improper as well); and he confused partisan motivation with race-based motivation, DE191-1 at 10; *but see Easley*, 532 U.S. at 257–58 (ditto). None of that is a valid methodology.

Even if the numerous errors in Dr. Lichtman's methodology go only to weight, an expert's "conclusion is no stronger than the evidence that underlies it." *Easley*, 532 U.S. at 249. And because the evidence and methodology Dr. Lichtman relied on was flawed, the district court's reliance on Dr. Lichtman was error.

### B.    *Plaintiffs failed to prove discriminatory purpose or effect.*

Even setting aside those legal errors, this should have been an easy case. The Legislature prohibited officials from using SB 168 to discriminate. Fla. Stat. § 908.109. It had a facially neutral reason for enacting the law. Fla. Stat. § 908.101. The legislative sponsors explained their motives, which were non-discriminatory. Senator Gruters said "this bill is about respecting the rule of law, it's about cooperating with the Federal Government[,] and it's about public safety." DE192-16 at 3–4. He "renounced discrimination." DE201 at 89. Representative Byrd said the law was about "respect[ing]

the rule of law." DE192-16 at 4. He too disclaimed an intent to be "anti-immigrant," instead noting that the law "is about public safety." *Id.* Indeed, even Plaintiffs' expert admitted that "key advocates" of SB 168 pointed to "public safety" as "the fundamental justification" for the bill. DE191-1 at 181. And the legislators reached those "reasonabl[e]" public-safety "conclu[sions]," *City of L.A. v. Barr*, 929 F.3d 1163, 1182 (9th Cir. 2019), after a process where almost every Plaintiff in this suit was heard, DE201 at 22, 28, 32–33, 34, 38, 39, 41, 56, and after they were urged to pass SB 168 by law enforcement, Tr. Day 5 at 43. That evidence readily suffices to defeat any claim that the Legislature enacted SB 168 "because of" any "adverse effects" that the law might have on racial minorities. *Feeney,* 442 U.S. at 279. Accordingly, Plaintiffs' discrimination claim would fail even without the "presumption of good faith," or the "extraordinary caution" federal courts must employ when concluding that a state Legislature engaged in intentional discrimination. *Miller*, 515 U.S. at 916. With them, Plaintiffs' charges of racial animus lack the thinnest veneer of plausibility. The district court's contrary conclusion was clearly erroneous.

### 1.    *Discriminatory effect*

The district court's discriminatory-effect analysis focused on comparing arrest and citation rates by race and then reasoning that immigration arrests under SB 168 will follow that pattern. DE201 at 70–71, 73–74. But that logic is flawed. For one, the district court erred in relying on SB 168's purported "outsized" effect on "Latinos," who "make up a large share of the unauthorized alien population." *Regents of the Univ. of*

*Cal.*, 140 S. Ct. at 1915. And even when it attempted to control for racial disparities in immigration status, the district court's generic statistical analysis is insufficient to establish discriminatory impact, because it does not show that those disparities involved similarly situated people of different races being treated differently. *See Armstrong*, 517 U.S. at 470; *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011); *United States v. Hedaithy*, 392 F.3d 580, 608 (3d Cir. 2004) (rejecting claim of racial discrimination based on racial disparities because the evidence did not control for "persons who [were] similarly situated").

Most of the evidence the district court relied on is simple data on the rates that different races interact with the criminal justice system, without any type of comparison between similarly situated individuals. *E.g.*, DE201 at 71 (offering arrest, detention, conviction, and incarceration data by race without any comparators). That cannot show discriminatory effect. *Armstrong*, 517 U.S. at 470. And even when a comparison was offered, DE201 at 70 (offering data on seatbelt citations by race and including data on who uses seatbelts), it is at such a high level of generality that it is impossible to conclude that similarly situated people were treated differently on the basis of race. *See United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (considering only "relative culpability" in assessing whether people were similarly situated is erroneous). Regardless, the disparities the district court pointed to—in, for example, seatbelt law enforcement— result from discretion vested in line-level police officers, DE201 at 71–72, and "merely proving that [a] discretionary system has produced a racial . . . disparity *is not enough*."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011); *see also United States v. Bass*, 536 U.S. 862, 864 (2002) (questioning whether a national statistical showing is sufficient when decisions are made at the local level).

But even crediting the district court's conclusion that "proactive policing" increases profiling, the district court still lacked evidence that SB 168 would increase profiling. DE201 at 74. That is because SB 168, once again, is not a proactive policing measure—it does not "increase the amount of contact officers will have with their communities and increase the use of officer discretion in performing these proactive policing tasks." DE201 at 72; *see supra* p. 20. SB 168 largely regulates the conduct of law enforcement in prisons and jails, where they respond to ICE detainer requests. DE201 at 56. It does not regulate police officers in the field. *See* Tr. Day 5 at 24 (SB 168 has "nothing to do with police officers . . . who are in patrol function or law enforcement function. This is exclusively—and the only time you're touched by this is if you are in a county jail, period."); *id.* at 54 (noting that state "street-level enforcement" of federal immigration law under the program deputizing state officials to enforce federal immigration law "was abolished under the Obama Administration" and so "[t]here is no deputization of state and local" law enforcement).[6] That is why "99 percent of the law enforcement officers" in Florida have no reason to know what SB168 is. Tr. Day 5

---

[6] There may also be times when local police assist in an ICE operation by, for example, providing a marked cruiser. But Sheriff Gualtieri testified that such cooperation is vanishingly rare. Tr. Day 5 at 66. And in any event, if ICE is picking the target, then local sheriffs would have no occasion to discriminate.

at 40; *see also* Tr. Day 2 at 52 (law enforcement said "nothing would change" because of SB 168). In short, SB 168 directs state and local officials to assist in carrying out immigration-enforcement decisions made by the federal government. And the district court pointed to no evidence that federally authorized-state-immigration enforcement has a discriminatory effect, especially when the state prohibits discrimination. *E.g.*, DE191-1 at 70 n.85 (admitting that there was no evidence on the race, ethnicity, or national origin of those subject to ICE referrals).

Without relying on flawed statistics about proactive policing, the district court was left with essentially nothing to support a finding of discriminatory effect. It pointed to anecdotal evidence about increased profiling. DE201 at 75. But the district court just said that increased profiling was "presumably" caused by the law. *Id.* A presumption is not enough. *See Greater Birmingham Ministries*, 992 F.3d at 1321 (plaintiffs must "establish" discriminatory effect); *Hand v. Scott*, 888 F.3d 1206, 1210 (11th Cir. 2018) (a "'risk' of disparate treatment" is "likely insufficient"). Even if the district court's presumption was meant to be a finding, the evidence did not support it. Plaintiffs' witnesses had no information about the reasons why individuals were detained or even their races. *E.g.*, Tr. Day 1 at 89–90, 116–17, 133, 193–94; Tr. Day 2 at 48–50, 111, 113–15, 119, 151–52. Indeed, some of the incidents Plaintiffs' witnesses cited occurred before SB 168 was in effect. Tr. Day 1 at 192–93; Tr. Day 2 at 165.

Compounding its error, the district court summarily concluded that this discriminatory impact was foreseeable and knowable by the Legislature. DE201 at 77.

But discriminatory effect and the Legislature's knowledge of that effect are separate factors. *See Greater Birmingham Ministries*, 992 F.3d at 1327. Even if the district court had properly concluded—based on reams of statistics that were not in the legislative record, such as Dr. Lichtman's report and testimony—that SB 168 had a discriminatory impact, that would not show that the Legislature knew of or foresaw that impact.

### 2.    *Historical background*

The district court found that the relevant history was "restrictive immigration laws" and found that meaningful because such laws "indirectly target certain races over others." DE201 at 80. But the Supreme Court has rejected that line of reasoning. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915. Because racial minorities "ma[de] up a large share of the unauthorized alien population," one would "expect them to make up an outsized share of . . . any cross-cutting immigration relief program." *Id.* "Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.*

Worse still, the district court ignored a plausible race-neutral historical account. *See Abbott*, 138 S. Ct. at 2327 (criticizing the lower court for discounting a "reasonable and certainly legitimate" explanation). As Sheriff Gualtieri explained, when an unauthorized immigrant has committed a crime, many sheriffs want to cooperate with federal immigration officials to avoid releasing that offender back into the community at the end of their sentence. Tr. Day 5 at 18. Historically, sheriffs cooperated by honoring federal detainers (requests to a local jail to hold an offender for 48 hours so

that ICE can pick the offender up). Tr. Day 5 at 16. But, in the early 2010s, a federal court ruled that detainers were not legally binding. Tr. Day 5 at 16–17. That left sheriffs in an "untenable position." Tr. Day 5 at 17. The federal government tried to solve that problem in several ways from 2014 to 2017, Tr. Day 5 at 17–18, 42–43, but what local law enforcement thought they needed was a "solution from the Florida Legislature" making clear that they could cooperate with federal immigration officials, Tr. Day 5 at 43. "That's what SB 168 did." Tr. Day 5 at 43.

Furthermore, SB 168 served to make clear that state and local officials were fully authorized to enforce federal immigration law in cooperation with federal authorities. The staff analysis on the bill noted that some "court opinions involving ICE detainers have found that local law enforcement agencies were without authority under state law to comply with an immigration detainer." DE199-8 at 13–14. Indeed, two years earlier a Massachusetts court had held that state and local officials lacked authority under state law to enforce federal immigration law absent authorization by the state legislature. *See Lunn v. Commonwealth*, 78 N.E.3d 1143, 1154–58 (Mass. 2017). SB 168 thus served to "clearly authorize[] compliance with immigration detainers and ICE warrants." DE199-8 at 13–14.

The district court appears to have rejected that historical account by concluding that SB 168's public safety rationale was pretextual because "crime rates in Florida" were falling; some studies indicate that sanctuary jurisdictions have lower crime rates; and unauthorized immigrants commit relatively few crimes. DE201 at 81–82. That is a

35

policy disagreement masquerading as constitutional law. The district court's nitpicking of the Legislature's policy judgment does not remotely support discriminatory intent. *Easley*, 532 U.S. at 248 (rejecting plaintiff's expert's view of what was "desirable," when the Legislature believed "the opposite"); *Greater Birmingham Ministries*, 992 F.3d at 1323 (crediting the state's explanation for a law). And anyway, it was entirely reasonable for the Legislature to have concluded that SB 168 promotes public safety—even in an environment of decreasing crime. Other courts have accepted the "reasonabl[e] conclu[sion]" that "[w]orking with the federal government to enforce the federal immigration laws against aliens who have committed crimes or are suspected of having committed crimes makes communities safer." *Barr*, 929 F.3d at 1182. And the Legislature was told by a sheriff that SB 168 was needed to prevent "danger to the community." Tr. Day 5 at 41–44. That assessment offers "a strong state policy in favor of [the challenged practice], for reasons other than race," and thus "is evidence that the [practice] does not have a discriminatory intent." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

### 3. *Contemporary statements and sequence of events.*

The district court found six types of statements and events relevant to its conclusion that "the specific sequence of events leading to SB 168," DE201 at 83, supported a finding of discriminatory intent, *see* DE201 at 84–96. But none in fact does.

*First*, the district court found it significant that FLIMEN advised Senator Gruters' staff on SB 168, reasoning that FLIMEN's discriminatory intent was smuggled

36

into the Legislature through Senator Gruters. DE201 at 84–87. Even accepting that narrative, however, the evidence proves little. Senator Gruters is just one legislator, and he does not necessarily share the views of those who lobby him—much less those who lobby his staff. Both the Supreme Court and this Court have roundly rejected such logic. *See Brnovich*, 141 S. Ct. at 2349–50 (rejecting the idea that a bill proponent's intent could be imputed to a legislator); *Easley*, 532 U.S. at 254 (discounting an email that was "addressed only to two members of the legislature"); *Thai Meditation Ass'n*, 980 F.3d at 835 ("[W]e cannot attribute the residents' purported bias to city officials absent at least some proof that the officials 'ratified' it."); *see also* Tr. Day 4 at 59 (Plaintiffs' expert standing that "of course FAIR and FLIMEN are not the only persons who would support SB 168"); *id.* at 87–88 (Plaintiffs' expert stating that except for Gruters and Byrd there was "not enough information" to show that any other legislator "worked intimately with FAIR and FLIMEN").

The narrative is also wrong. "It is insulting to suggest" that Senator Gruters was a "mere dupe[]" for FLIMEN. *Brnovich*, 141 S. Ct. at 2350. He has a "duty to exercise [his] judgment" in considering legislation. *Id.* And his own statements indicate that he supported SB 168 for race-neutral reasons. He explained "this bill is about respecting the rule of law, it's about cooperating with the Federal Government[,] and it's about public safety." DE192-16 at 3–4.

*Second*, the district court concluded that FLIMEN's animus was made known to Senator Gruters. DE201 at 88–89. But when Senator Gruters was confronted with

claims of animus, he condemned it and "renounced discrimination." DE201 at 89. That was not mere lip-service: the enacted law did so as well in prohibiting discrimination. Fla. Stat. § 908.109.

*Third*, the district court zeroed in on Senator Gruters' and Representative Byrd's participation, with other legislators, in a "Victims of Illegal Immigration Day" event alongside a representative from FLIMEN. DE201 at 89–92. But statements made at that event do not indicate discriminatory intent. Senator Gruters said that SB 168 was about "public safety." DE192-16 at 3–4. And Representative Byrd said he supported the bill "to respect the rule of law." *Id.* at 4. The district court found it significant that speakers at the event used terms like "illegals, criminals, murderers, and victimizers." DE201 at 92. But the term "illegal" has been used recently and repeatedly by the courts. *E.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1851 (2017) (Kennedy, J.) ("illegal aliens"); *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 155 (2002) (Breyer, J., dissenting) ("illegal immigrants" and "illegal alien"); *Plyler v. Doe*, 457 U.S. 202, 207, 208, 215, 228 (1982) (Brennan, J.) ("illegal alien[]"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 875 (1975) ("illegal immigrants"). And the remaining terms—some of which were uttered by non-legislative speakers—reflect the facts of particular cases, not broad characterizations about any race. *E.g.*, DE192-16 at 6 (speaker describes how an unauthorized immigrant killed her son). Those words are not evidence of a racially discriminatory purpose.

The district court next relied on statements made by non-legislators at the event. DE201 at 90–91. Those statements are "unilluminating" because they were not made by the "relevant actors"—the legislators. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916. And regardless, in context, the statements do not express racial animus—they largely express the understandable frustration of victims of preventable crimes. DE192-16 at 6–11.

Finally, the district court found it problematic that the event featured FLIMEN and occurred after an opponent of SB 168 had flagged FAIR and CIS as "hate groups." DE201 at 90. Relying on "speculation by the bill's opponents about proponents' motives" is, however, improper. *Veasey*, 830 F.3d at 233 (plurality op.). Guilt-by-association would be an especially inappropriate inference here, as a majority opinion of the U.S. Supreme Court had recently relied on CIS data. *Arizona*, 567 U.S. at 398 (opinion of Kennedy, J., joined by Roberts, C.J., and Ginsburg, Breyer, and Sotomayor, JJ.). In any case, FLIMEN is an "entirely separate entit[y]," from those groups. DE201 at 43; *see also* DE201 at 11.

*Fourth*, the district court concluded that Representative Byrd and Senator Gruters' statements demonstrated racial prejudice. DE201 at 93–95. Even if that were so, this Court cannot "impute the discriminatory intent of one or a few decisionmakers to the entire group." *Thai Meditation Ass'n*, 980 F.3d at 836.

But the statements do not evidence discriminatory intent anyway. *See Easley*, 532 U.S. at 253 (on clear error review considering the "full statement" and rejecting a trial

court's reading). Representative Byrd's statement just recounted the background of a parent whose child had been killed by an unauthorized immigrant. DE192-16 at 5. The district court read into Representative Byrd's statement "a belief that any non-citizen that is present in the United States should be subject to stricter laws." DE201 at 93. Representative Byrd said the exact opposite; he said "[t]his is not anti-immigrant . . . [w]e are applying the same rules that we would apply to U.S. citizens that we're going to apply to anyone else." DE192-16 at 4. His direct evidence is "stronger" than any "circumstantial evidence proffered by the plaintiffs." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991). Senator Gruters, for his part, spoke about public safety. DE192-16 at 3.

The district court next analyzed an ad Senator Gruters ran in his election campaign and a poster Senator Gruters had in his office, which the district court opined, "promoted the immigrant threat narrative." DE201 at 93. The campaign ad urged the federal government to improve immigrant enforcement at the Southern Border. *Id.* The poster depicted people who had been deported from Sarasota County after committing crimes, DE201 at 94, consistent with SB 168's race-neutral purpose to promote public safety. Such "campaign statements and . . . similar statements" are poor evidence of intent. *See Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 374 (4th Cir. 2018) (Niemeyer, J., dissenting), *judgment vacated*, 138 S. Ct. 2710 (2018). Moreover, they were made at different times and in different contexts and are thus not probative of a racist intent. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916.

40

*Fifth*, the district court found it significant that supporters of SB 168 rejected amendments that the district court believed would have "ameliorate[d] the bill's effects." DE201 at 95. But SB 168 already prohibited racial discrimination. Maybe the Legislature agreed that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). Regardless, that the Legislature "did not include the alternative option that Plaintiffs would have preferred" is "unpersuasive" evidence of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1327.

*Sixth*, the district court repeated its view that the Legislature could not have been motivated by protecting public safety because of "decreasing crime rates." DE201 at 96. But, as explained, the Legislature heard from Florida sheriffs that SB 168 would improve public safety, Tr. Day 5 at 41–44, and it was entitled to credit that account. The district court also pointed to an alleged absence of "research," "due diligence," and "statistical data" about "crime rates." DE201 at 96. It is extraordinary that the district court held the Legislature to such a standard, which did not need to commission a regression analysis to conclude rationally that a law facilitating federal immigration enforcement would improve public safety.

### 4.    *Alleged departures from the norm*

The district court next concluded that "certain procedural and substantive departures" from the norm supported racially discriminatory intent. DE201 at 96. It first reiterated its conclusion that "FLIMEN and FAIR" had untoward "influence" over

the legislators involved with the bill. DE201 at 97. But as discussed, even the district court was only able to conclude that one Senator had significant contact with FLIMEN, and no evidence supports that even that one Senator "ratified" whatever intent FLIMEN might have had, *supra* at pp. 36–37.

The district court also credited Plaintiffs' testimony that SB 168's "felt rushed." DE201 at 97. But Florida has a part-time Legislature with an abbreviated legislative session every term, lasting only 60 days. *See* Art. III, § 3(d), Fla. Const. In any event, "the brevity of the legislative process" cannot "give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2328–29.

That leaves the district court's "most important[]" purported departure: the inclusion of FAIR and CIS data in the Senate staff analysis. DE201 at 97–99. In the court's view, the inclusion of FAIR and CIS data "strongly suggests the existence of underlying racial animus." *Id.* at 99. But the reliance on FAIR and CIS data was innocuous. The staff analysis cites FAIR and CIS to make the point that "[i]t is difficult to determine how many sanctuary jurisdictions" there are. DE192-4 at 4. And then it rejects the FAIR and CIS data in favor of a more "objective" measure. *Id.*

In any event, the district court's theory would equally demonstrate racial animus on the part of many courts, including the Supreme Court and even the district court below, which have also cited data provided by CIS. *See Arizona*, 567 U.S. at 398; *Bandak v. Eli Lilly & Co. Ret. Plan*, 587 F.3d 798, 801 (7th Cir. 2009); *Bellitto v. Snipes*, 302 F.

Supp. 3d 1335, 1348–49 (S.D. Fla. 2017) (Bloom, J., the district judge below). FAIR and CIS have also been cited by the United States government (during the Clinton Administration), *e.g.*, Br. for the United States, *United States v. Master*, No. 96-8373, 1997 WL 33543811, at *17 (11th Cir. Jan. 23, 1997); numerous states, *e.g.*, Br. of Amici Curiae Louisiana et al., *Trump v. New York*, No. 20-366, 2020 WL 6507263, at *15 n.13 (U.S. Oct. 30, 2020); and human rights organizations, *e.g.*, Br. of Amici Curiae N.C. State Conference of the NAACP, et al., *Farm Lab. Organizing Comm. v. Stein*, No. 21-1499, 2021 WL 5711664, at *20 n.44 (4th Cir. Nov. 24, 2021).

### 5.    *Rejected amendments*

Finally, the district court concluded that the Legislature's rejection of various amendments demonstrated improper intent. DE201 at 99–101. But most of the amendments did not address discriminatory effect—they addressed the substantive reach of the bill. *See Easley*, 532 U.S. at 249 (demanding that alternatives satisfy the Legislature's "nonracial political goals"). For example, the district court faulted the Legislature for applying SB 168 to misdemeanants, DE201 at 99, and to people with various immigration statuses, *id.* at 100. But one of the goals of SB 168 was to enhance cooperation with federal immigration officials, which required a broad substantive scope—if federal immigration authorities, for example, issued a detainer on a misdemeanant, refusing the detainer would not be cooperation.

Only one amendment, which would have required every law enforcement officer to complete implicit bias training, focused on limiting discriminatory treatment without

cutting back on SB 168's legitimate cooperation goal. But the Legislature could have concluded that it had addressed the need to avoid on-the-ground discrimination more directly—by prohibiting discrimination. Fla. Stat. § 908.109. Whatever the reason, that Plaintiffs or the district court may have preferred a different method is not evidence of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1327.

*    *    *

Considering all the evidence, the district court's discriminatory-intent finding was egregiously wrong. It analyzed the conduct of two legislators, concluded that their stray remarks, associations, and staffers' emails demonstrated bias, and then concluded that because those legislators were biased, the law they supported must have been enacted with discriminatory purpose, even though the law forbids discrimination. "Nothing in *Arlington Heights*," however, "suggests that the Court's listing of relevant factors licenses courts to string together bits of circumstantial evidence that wholly lack racial content and then undo any law with an incidental disparate impact." *Veasey*, 830 F.3d at 284 (Jones, J., dissenting). The district court did just that.

## III.   The Transport Provision Is Not Preempted.

The Transport Provision authorizes corrections officers to "securely transport" individuals "subject to an immigration detainer" for purposes of "transfer to federal custody." Fla. Stat. § 908.104(4). The United States took the position that the provision was not preempted. DE23. But the district court held the opposite, reasoning that the provision is preempted because it authorizes "unilateral conduct" that is "expressly

prohibited" by the Supreme Court's decision in *Arizona*. DE164 at 39. In reaching these conclusions, the district court misapplied the preemption standard, misinterpreted state law, and misunderstood federal law.

Conflict preemption "occurs when compliance with both federal and state regulations is impossible or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 66–67 (1941)). In considering such a challenge, courts apply a "presumption against preemption," *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009), and a "party asserting conflict preemption faces a high bar." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017). Further, because this is a pre-enforcement facial challenge, Plaintiffs had to show that "no set of circumstances exist under which the [law] would be valid." *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). And if "[t]here is a basic uncertainty about what the law means and how it will be enforced," it is "inappropriate to assume" the law "will be construed in a way that creates a conflict with federal law." *Arizona*, 567 U.S. at 413–14.

The district court erred in concluding that the Transport Provision was preempted. It reasoned that Congress created one way for states to assist in federal immigration enforcement—287(g) agreements—and then hypothesized that the Transport Provision might be inconsistent with that requirement because it could allow

transportation without such an agreement. DE164 at 38–41. That is wrong at every level.

*First*, the district court was wrong that 287(g) agreements are the exclusive mechanism for cooperating with the federal government in transporting removable aliens across state lines. Such agreements authorize state officials to perform "a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across States lines to detention centers)." 8 U.S.C. § 1357(g)(1). But the statute expressly contemplates that state officials may assist in the enforcement of federal immigration law even without such an agreement. Congress was careful to clarify that "[n]othing in" section 287(g) of the INA "shall be construed to require an agreement under this subsection in order for any officer or employee of a State" to "cooperate . . . in the identification, apprehension, detention, or removal of aliens not lawfully present." *Id.* § 1357(g)(10). In other words, § 1357(g)(1) designates "transportation . . . across States lines" as a form of "detention of aliens," and § 1357(g)(10) makes clear that "cooperation" in the "detention . . . of aliens" does not require a section 287(g) agreement. *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) (referring to § 1357(g)(10) as a "critical savings clause" and rejecting a similar argument).

*Second*, the district court mistakenly concluded that the Transport Provision authorizes unilateral state enforcement of federal immigration law rather than cooperation pursuant to a request from the federal government. On the contrary, the

Transport Provision authorizes transfer only after the correctional facility "receives verification" from the federal government that a person is "subject to an immigration detainer," Fla. Stat. § 908.104(4), which is a "request" for assistance from the federal government, *id.* § 908.102(2). The Transport Provision also only authorizes transportation to a facility for "transfer to federal custody," *id.* § 908.104(4), which presumes the federal government's consent. In any event, the Court should presume in this pre-enforcement facial challenge that Florida will implement the Transport Provision in a way that facilitates cooperation with the federal government, rather than by engaging in unilateral conduct. *See Arizona*, 567 U.S at 413–14.

Finally, even if this Court finds that Florida may not validly authorize corrections officers to transport removable aliens across state lines, state law would be preempted only "to the extent of any conflict with a federal statute." *Hillman*, 569 U.S. at 490 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Even in that event, the Court should make clear that the statute is otherwise valid and allow enforcement of the Transport Provision within the state.

## CONCLUSION

For the foregoing reasons, this Court should vacate and remand with instructions to dismiss for lack of jurisdiction. In the alternative, the Court should reverse and remand with instructions to enter judgment for Defendants.

Respectfully submitted,

ASHLEY MOODY
*Attorney General*

<u>*/s/ Evan Ezray*</u>
HENRY C. WHITAKER
*Solicitor General*
Daniel Bell
*Chief Deputy Solicitor General*
EVAN EZRAY
*Deputy Solicitor General*
JAMES H. PERCIVAL
*Deputy Attorney General of Legal Policy*
NATALIE P. CHRISTMAS
*Assistant Attorney General of Legal Policy*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3684
(850) 410-2672 (fax)
*evan.ezray@myfloridalegal.com*

May 18, 2022

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,026 words.

2.      This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Evan Ezray*
Evan Ezray

## CERTIFICATE OF SERVICE

I certify that on May 18, 2022, I electronically filed the foregoing Brief with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.


*/s/ Evan Ezray*
Evan Ezray