No. 21-13657

𝕴𝖓 𝖙𝖍𝖊

# United States Court of Appeals
## for the Eleventh Circuit

―――――

City of South Miami, *et al.*,

*Appellees/Cross-Appellants*,

v.

Governor of the State of Florida, *et al.*

*Appellants/Cross-Appellees.*

―――――

On Appeal from the United States District Court for the
Southern District of Florida, Miami Division.
No. 1:19-cv-22927 — Beth Bloom, *Judge*

―――――

## BRIEF OF GEORGIA, ALABAMA, ALASKA, ARIZONA, ARKANSAS, INDIANA, KANSAS, KENTUCKY, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TEXAS, UTAH, AND WEST VIRGINIA AS AMICI CURIAE SUPPORTING APPELLANTS

―――――

Steve Marshall
  *Attorney General of Alabama*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Reid Harris
  *Assistant Attorney General*
Office of the Alabama
  Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@alabamaag.gov

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Drew F. Waldbeser
  *Deputy Solicitor General*
Hannah N. Basta
  *Assistant Attorney General*
Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Additional Counsel Listed Below*

South Miami v. Governor of Florida, No. 21-13657

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 and 28.1, I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Akbar, Amna A., Amicus Curiae

Americans for Immigrant Justice, Inc., Appellee/Cross-Appellant

Baluarte, David C., Amicus Curiae

Barry, Caitlin, Amicus Curiae

Basta, Hannah N., Counsel for Amicus Curiae State of Georgia

Bell, Daniel, Counsel for Appellants/Cross-Appellees

Bender, Steven W., Amicus Curiae

Bettinger-Lopez, Caroline, Counsel for District Court Organizational Amici Curiae

Bingham, Lauren C., Counsel for United States

Bloom, Judge Beth, Southern District of Florida

Brnovich, Mark, Counsel for Amicus Curiae State of Arizona

Brodeen, Karen Ann, Counsel for Appellants/Cross-Appellees

Cameron, Daniel, Counsel for Amicus Curiae State of Kentucky

Carr, Christopher M., Counsel for Amicus Curiae State of Georgia

Casper Sanchez, Benjamin, Amicus Curiae

South Miami v. Governor of Florida, No. 21-13657

Center for Gender & Refugee Studies, Amicus Curiae

Chan, Linus, Amicus Curiae

Chavez, Paul R., Counsel for Appellees/Cross-Appellants

Christmas, Natalie, Counsel for Appellants/Cross-Appellees

Churgin, Michael J., Amicus Curiae

City of South Miami, Appellee/Cross-Appellant

Cooper, Holly S., Amicus Curiae

DeSantis, Ron, Appellant/Cross-Appellee

Dwyer, Robert Kiernan, Counsel for District Court Organizational
    Amici Curiae

Eagly, Ingrid, Amicus Curiae

Ernst, Colleen Maher, Counsel for Appellants/Cross-Appellees

Evans, Kate, Amicus Curiae

Ezray, Evan, Counsel for Appellants/Cross-Appellees

Family Action Network Movement, Inc., Appellee/Cross-Appellant

Farmworker Association of Florida, Inc., Appellee/Cross-Appellant

Fitch, Lynn, Counsel for Amicus Curiae State of Mississippi

Fleming, Mark, Counsel for Scholar Amici Curiae

Florida Council Against Sexual Violence, Amicus Curiae

Florida Immigrant Coalition, Inc., Appellee-Cross-Appellant

Florida Legal Services, Amicus Curiae

South Miami v. Governor of Florida, No. 21-13657

Goettel, Katherine Melloy, Counsel for Scholar Amici Curiae

Gonzalez, Mich, Counsel for Appellees/Cross-Appellants

Greer, Alana J., Counsel for Appellees/Cross-Appellants

Harbaugh, Joseph, Amicus Curiae

Harris, A. Reid, Counsel for Amicus Curiae State of Alabama

Haskell, Miriam Fahsi, Counsel for Appellees/Cross-Appellants

Hernandez, Laura A., Amicu Curiae

Hernandez Anderson, Anne Janet, Counsel for Appellees/Cross-Appellant

Hines, Barbara, Amicus Curiae

Hlass, Laila L., Amicus Curiae

Hoffman, Geoffrey A., Amicus Curiae

Hope Community Center, Inc., Appellee/Cross-Appellant

Human Rights Watch, Amicus Curiae

Hunt, Joseph H., Counsel for United States

Jaen, Ulysses, Amicus Curiae

Keyes, Elizabeth, Amicus Curiae

Knudsen, Austin, Counsel for Amicus Curiae State of Montana

Kurzban, Ira, Amicus Curiae

LaCour Jr., Edmund G., Counsel for Amicus Curiae State of Alabama

South Miami v. Governor of Florida, No. 21-13657

Lai, Annie, Amicus Curiae

Lasch, Christopher N., Counsel for Scholar Amici Curiae

Lee, Jennifer J., Amicus Curiae

Londono, Oscar Hernan, Counsel for Appellees/Cross-Appellants

Los Angeles Center for Law and Justice, District Court
    Organizational Amicus Curiae

Louis, Magistrate Judge Lauren Fleischer, Southern District of
    Florida

Lyon, Beth, Amicus Curiae

Markowitz, Peter L., Amicus Curiae

Marshall, Steve, Counsel for Amicus Curiae State of Alabama

Medina, M. Isabel, Amicus Curiae

Meili, Stephen, Amicus Curiae

Mesa-Estrada, Victoria, Counsel for Appellees/Cross-Appellants

Moody, Ashley, Appellant/Cross-Appellee

Moore, Jennifer, Amicus Curiae

Morrisey, Patrick, Counsel for Amicus Curiae State of West
    Virginia

M.U.J.E.R. Inc., Amicus Curiae

Myers, III, Howard S. (Sam), Amicus Curiae

National Immigrant Justice Center, Amicus Curiae

O'Connor, John M., Counsel for Amicus Curiae State of Oklahoma

South Miami v. Governor of Florida, No. 21-13657

Oxfam America, Amicus Curiae

Patel, Anita J., Counsel for Appellants/Cross-Appellees

Paxton, Ken, Counsel for Amicus Curiae State of Texas

Peachey, William C., Counsel for United States

Percival, James, Counsel for Appellants/Cross-Appellees

Peterson, Doug, Counsel for Amicus Curiae State of Nebraska

Petrany, Stephen J., Counsel for Amicus Curiae State of Georgia

QLatinx, Appellee/Cross-Appellant

Quigley, William, Amicus Curiae

Ramkumar, Archith, Counsel for United States

Reuveni, Erez, Counsel for United States

Reyes, Maritza, Amicus Curiae

Reyes, Sean D., Counsel for Amicus Curiae State of Utah

Rogerson, Sarah, Amicus Curiae

Rokita, Theodore E., Counsel for Amicus Curiae State of Indiana

Romero, Victor, Amicus Curiae

Rosenbaum, Carrie, Amicus Curiae

Rumbaut, Rubén G., Amicus Curiae

Rutledge, Leslie, Counsel for Amicus Curiae State of Arkansas

Rural Women's Health Project, District Court Organizational
    Amicus Curiae

South Miami v. Governor of Florida, No. 21-13657

Schmidt, Derek, Counsel for Amicus Curiae State of Kansas

Schmitt, Eric, Counsel for Amicus Curiae State of Missouri

Sharpless, Rebecca Ann, Counsel for Appellees/Cross-Appellants

Sinha, Anita, Amicus Curiae

State of Alabama, Amicus Curiae

State of Alaska, Amicus Curiae

State of Arizona, Amicus Curiae

State of Arkansas, Amicus Curiae

State of Georgia, Amicus Curiae

State of Indiana, Amicus Curiae

State of Kansas, Amicus Curiae

State of Kentucky, Amicus Curiae

State of Mississippi, Amicus Curiae

State of Missouri, Amicus Curiae

State of Montana, Amicus Curiae

State of Nebraska, Amicus Curiae

State of Oklahoma, Amicus Curiae

State of South Carolina, Amicus Curiae

State of Texas, Amicus Curiae

State of Utah, Amicus Curiae

South Miami v. Governor of Florida, No. 21-13657

State of West Virginia, Amicus Curiae

Stoddard, Philip K., Appellee/Cross-Appellant

Stumpf, Juliet P., Amicus Curiae

Su, Rick, Amicus Curiae

Tahirih Justice Center, Amicus Curiae

Taylor, Treg R., Counsel for Amicus Curiae State of Alaska

Teegen, Elizabeth Ann, Counsel for Appellants/Cross-Appellees

The Guatemalan-Maya Center, Inc., Appellee/Cross-Appellant

Throne, Barbara Jean, Counsel for Appellants/Cross-Appellees

Thronson, David B., Amicus Curiae

Torrey, Philip L., Amicus Curiae

Treuthart, Mary Pat, Amicus Curiae

Trucios-Haynes, Enid, Amicus Curiae

University of Miami School of Law Human Rights Clinic, Amicus
    Curiae

Vastine, Michael, S., Counsel for Scholar Amicus Curiae

Vázquez, Yolanda, Amicus Curiae

Waldbeser, Drew F., Counsel for Amicus Curiae State of Georgia

WeCount!, Inc., Appellee/Cross-Appellant

Wenger, Edward Mark, Counsel for Appellants/Cross-Appellees

South Miami v. Governor of Florida, No. 21-13657

Westminster Presbyterian Church United of Gainesville, Florida, Inc., Appellee/Cross-Appellant

Whitaker, Henry, Counsel for Appellants/Cross-Appellees

Wiebe, Virgil, Amicus Curiae

Wilson, Alan, Counsel for Amicus Curiae State of South Carolina

Wishnie, Michael J., Amicus Curiae

Wizner, Stephen, Amicus Curiae

Wojcik, Mark E., Amicus Curiae

/s/ *Stephen J. Petrany*
Stephen J. Petrany

# TABLE OF CONTENTS

**Page**

Table of Authorities .......................................................................... x

Interest of Amici Curiae ................................................................. 1

Argument ...................................................................................... 4

    I.  Plaintiffs can overcome the presumption of legislative good faith only by establishing the legislature's discriminatory intent with the clearest proof. ............................................... 4

    II.  Courts cannot ascribe discriminatory intent to all policies that seek to enforce immigration laws. ................................. 8

        A.  Courts increasingly mistake certain policy positions, especially opposition to unlawful immigration, as racially discriminatory. .................................................... 9

        B.  The district court ascribed racial animus to the Florida Legislature with no justification whatsoever. .............. 11

    III. Courts cannot impute ill-intent to a legislature based on minimal connections between a few legislators and (supposedly) racially motivated private parties................. 20

Conclusion...................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ........................................................... 5, 18

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................... 3, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................... 6

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021) ........................................................*passim*

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ................................................................... 15

*Democratic Nat'l Comm. v. Hobbs*,
  948 F.3d 989 (9th Cir. 2020) .................................................. 9, 19

*Demore v. Kim*,
  538 U.S. 510 (2003) ................................................................... 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ............................................................... 14

*Edwards v. Aguillard*,
  482 U.S. 578 (1987) ..................................................................... 1

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ................................................................... 24

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ................................................................... 21

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ............................................................... 2, 15

*Flemming v. Nestor*,
    363 U.S. 603 (1960) .......................................................... 6

*Fletcher v. Peck*,
    10 U.S. 87 (1810) ............................................................. 1

*Greater Birmingham Ministries v. Sec'y of State for*
    *Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ............................................20, 23

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ............................................................. 5, 6

*Lanfear v. Home Depot, Inc.*,
    679 F.3d 1267 (11th Cir. 2012) ........................................ 5

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of*
    *State*,
    ___ F.4th ___, 2022 WL 1435597 (11th Cir. May 6,
    2022) ................................................................*passim*

*Main v. Office Depot, Inc.*,
    914 F. Supp. 1413 (S.D. Miss. 1996) ....................................... 23

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) ............................................................. 5, 6

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011) ............................................................. 5

*Miller v. Johnson*,
    515 U.S. 900 (1995) ............................................................. 4

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ............................................................. 14

*N. Carolina State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ....................................... 23

*Pension Ben. Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) ..................................................................... 18

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ..................................................................... 4

*Smith v. Doe*,
   538 U.S. 84 (2003) ....................................................................... 6

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army*
   *Corps of Engineers*,
   531 U.S. 159 (2001) ..................................................................... 18

*Tenney v. Brandhove*,
   341 U.S. 367 (1951) ..................................................................... 8

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive*
   *Communities Project, Inc.*,
   576 U.S. 519 (2015) ..................................................................... 18

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................. 21

*Utah Republican Party v. Cox*,
   892 F.3d 1066 (10th Cir. 2018) ................................................... 22

*Van Straaten v. Shell Oil Prods. Co.*,
   678 F.3d 486 (7th Cir. 2012) ....................................................... 22

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ......................................... 5, 7, 9, 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................... 7, 19

## Other Authorities

Dyin Atewologun, et al, *Unconscious Bias Training: An Assessment of the Evidence for Effectiveness*, Equality and Human Rights Commission (March 2018) ........................................................................ 17

Jason Richwine & Robert Rector, *The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer* The Heritage Foundation (May 6, 2013) ............15, 16

The Federalist, No. 78 (Alexander Hamilton) ................................. 4

*The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*, Congressional Budget Office (December 2007) ........................ 16

Tiffany L. Green, *The Problem with Implicit Bias Training*, Scientific America (August 28, 2020) ....................... 17

## INTEREST OF AMICI CURIAE

Discerning a legislature's intent is always tricky business. Each legislator votes for their own reasons. Some are partisan and self-serving; others are noble. Every enacted statute reflects the consensus (and compromise) of hundreds of legislators on deeply complex questions. Indeed, "[t]he number of possible motivations [for passing a statute] … is not binary, or indeed even finite." *Edwards v. Aguillard*, 482 U.S. 578, 636–37 (1987) (Scalia, J., dissenting). Sometimes, the result is puzzling, unwise, or illogical. Almost always, the process is inefficient. That makes judicial second-guessing easy. But in our "government of the people, by the people, for the people," legislatures legislate. Courts do not.

That is precisely why, since the earliest days of the Republic, federal courts have approached constitutional challenges to state laws with humility. As Chief Justice Marshall declared, "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810). Instead, "[t]he opposition between the constitution and the law" must be "clear." *Id.* This Court reaffirmed just weeks ago that "the good faith of the state legislature must be presumed."

1

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, ___
F.4th ___, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022)
(quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)).

Even so, in many recent decisions, the presumption of
legislative good faith has been ignored, with some courts failing to
"meaningfully account[] for the presumption at all." *Id.* As a
result, the *amici* States must constantly defend against legal
challenges to state statutes brought by those who oppose the
results of the legislative process. These litigants invite federal
courts to substitute their own judgment for that of the legislature.
Too often, courts accept the invitation to usurp the legislative role
by ascribing invidious intent to legislative enactments based on
sheer policy disagreement, dressed up as supposed discrimination.
*See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349–
50 (2021). The Constitution forbids that, and for good reason. *FCC
v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). Federal courts
are poorly positioned to weigh the many interests at stake. Their
decisions are rendered without public debate. And, because they
are not elected, they cannot be held accountable by the people.

Here, the district court fell prey to exactly this temptation
when it enjoined SB 168—a Florida law that requires local law
enforcement to cooperate with the federal government in enforcing

federal immigration laws. States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). A legislative judgment that the country's *existing laws* should be enforced is not an extreme or suspect position. Yet the district court held the law facially invalid, because it was supposedly enacted with discriminatory intent, even though the law specifically *prohibits* racial discrimination.

The Court did not point to any discrimination apparent in the text of the law (there is none). Instead, relying on a purported "expert" in legislative racism, the court pointed to "anti-immigrant" statements made by *private advocacy groups*, held that opposition to unlawful immigration is necessarily racist, and then imputed *those* motivations to the entire Florida legislature. This analysis was egregiously wrong, from top to bottom. The district court might (and clearly does) disagree with Florida's political judgment about whether immigration laws should be enforced, but that should not be relevant.

This Court should undo the district court's openly partisan ruling and put an end to this practice of legislation by judicial fiat. The duly enacted laws of the *amici* States deserve no less.

# ARGUMENT

## I. Plaintiffs can overcome the presumption of legislative good faith only by establishing the legislature's discriminatory intent with the clearest proof.

The presumption of legislative good faith requires courts to presume that a legislature acted for the reasons apparent on the face of the statute unless there is unmistakable evidence to the contrary. Every time legislatures act, they must "exercise the political judgment necessary to balance competing interests." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). And those judgments deserve deference. Disputes about whether a law is "undemocratic and unwise" should remain in the statehouse, not the courthouse. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 280 (1979). The presumption of legislative good faith thus safeguards the separation of powers between the States and the federal government, reflects the near-impossibility of divining the intent of a multi-member legislative body, and steers federal courts away from the temptation of ascribing bad motives whenever a judge views the legislature's work as bad policy. The presumption keeps the judiciary out of the political fray and ensures that they do not "substitute their own pleasure to the constitutional intentions of the legislature." The Federalist, No. 78 (Alexander Hamilton).

The presumption can be overcome, of course, such as when the State's conceded "aim" is to "disenfranchis[e] practically all of" one racial group. *Hunter v. Underwood*, 471 U.S. 222, 230 (1985). But to prove the extraordinary claim that the act of an entire legislature is infected by discriminatory animus, plaintiffs must cite extraordinary evidence. It cannot be enough to "string together bits of circumstantial evidence that wholly lack racial content and then undo any law with an incidental disparate impact." *Veasey v. Abbott*, 830 F.3d 216, 284 (5th Cir. 2016) (Jones, J., concurring in part). Where there are "legitimate reasons" for a law, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 299 (1987).

The presumption of legislative good faith does not refer merely to a burden of proof or burden of persuasion. *See generally Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 n.4 (2011). After all, even in its absence, a plaintiff would bear these burdens. Thus, the *Abbott* Court declared that even if some of plaintiffs' evidence could "give rise to an inference of bad faith," the evidence was not "strong enough to overcome the presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2329; *cf. Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1281 (11th Cir. 2012) (discussing the "presumption of prudence" in the ERISA context as "embod[ying]

5

the notion of an outcome favored by the law; it prescribes who is to win in almost all of the circumstances that can be envisioned—not all, but almost all").

The presumption thus requires the "clearest proof" that a legislature enacted a facially neutral law for improper reasons. *Smith v. Doe*, 538 U.S. 84, 92 (2003). This makes good sense, for "[i]nquiries into congressional motives or purposes are a hazardous matter." *Hunter*, 471 U.S. at 228 (citation omitted); *accord Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed."). Proving an illicit purpose is hard enough where the decision maker is a single government official. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009). But plaintiffs face even greater "difficulties" where the decision maker is a legislative body as large as a state legislature. *Hunter*, 471 U.S. at 228. "[O]nly the clearest proof will suffice" to establish an entire legislature's supposedly illicit motive. *Smith*, 538 U.S. at 92 (quotation marks omitted); *see also McCleskey*, 481 U.S. at 298–99.

Requiring the clearest proof of racial animus to overcome the presumption of legislative good faith is not in tension with

6

*Arlington Heights*. The inquiries outlined by the Supreme Court can yield evidence of improper purposes sufficient to overcome the presumption of constitutionality, but that evidence must be especially clear. That is precisely why "in each case" the *Arlington Heights* Court "cited to exemplify its listed factors, discriminatory motive could be easily inferred." *Veasey*, 830 F.3d at 283 (Jones, J., concurring in part) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–71 (1977)).

Some courts have missed this point. They treat *Arlington Heights* as having created a series of boxes to check: if plaintiffs can come forward with a little evidence for each of the listed factors, then the court can enjoin the law as racist. But nothing in *Arlington Heights* abrogated the presumption of legislative good faith. To the contrary, the decisions to which the *Arlington Heights* Court pointed demonstrate that a plaintiff's burden when leveling a discriminatory intent claim is not easily satisfied. 429 U.S. at 266. Were it otherwise, the presumption of good faith would lack real force.

"In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951). But unless racial motives are indisputably clear, "[c]ourts are not the

7

place for such controversies." *Id.* The Court should reaffirm that to overcome the presumption of legislative good faith and prove a claim of discriminatory intent under the Equal Protection Clause, plaintiffs must establish the Legislature's illicit motive by the clearest proof.

## II. Courts cannot ascribe discriminatory intent to all policies that seek to enforce immigration laws.

This case illustrates the importance of enforcing the presumption of legislative good faith. It has become increasingly common for courts to invalidate state laws not because there is evidence of any racial intent but because courts *assume* that certain policy positions (like opposition to unlawful immigration) are inherently suspicious. The district court here joined that growing chorus of federal courts holding SB 168 to be racially discriminatory because its supporters opposed unlawful immigration. That flips the presumption of good faith on its head, and this Court should emphatically reject that outcome-based reasoning.

A.  **Courts increasingly mistake certain policy positions, especially opposition to unlawful immigration, as racially discriminatory.**

It is in fashion for courts to openly declare that a legislature acts in a discriminatory manner simply because it chooses a different *policy* than one favored by particular interest groups, especially groups that claim to speak for minority communities. To cite just a few examples: In *Democratic National Committee v. Hobbs*, the *en banc* Ninth Circuit held that Arizona was not "responsive[]" to minority voters because it did not have sufficient *government spending*. 948 F.3d 989, 1030 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l. Comm.*, 141 S. Ct. 2321 (2021). But of course, whether increased government spending serves or disserves the populace (minorities included) is a fundamentally political matter. To hold that one side of that issue is ignoring or rejecting minority concerns—or worse, discriminating against minorities—has no place in a judicial opinion.

Similarly, in *Veasey*, a Texas district court purported to invalidate a Texas voter-ID law while relying heavily on the policy preferences of the law's opponents. 71 F. Supp. 3d at 659. The district court seemed to accept that "the 2011 [legislative] session was highly racially-charged, and anti-Hispanic," because the

session considered, *inter alia*, "the rollback of the Affordable Health Care Act." *Id.* at 659 n.204. Whatever one thinks of opposition to the Affordable Health Care Act, it is not inherently racially motivated. Yet somehow opposition to a controversial law became entangled with racial animus in a judicial opinion.

Indeed, although the *en banc* Fifth Circuit corrected some of that district court's errors, it later injected its own. *See Veasey,* 830 F.3d at 236–37. For instance, the Fifth Circuit faulted the Texas Legislature for declining to adopt a "number of proposed ameliorative measures that might have lessened" the supposedly "disparate impact" of the voter-ID bill. *Id.* at 237. The Legislature declined "to expand the types of accepted IDs, expand the operating hours of … stations issuing voter IDs." *Id.* Again, whatever one thinks of these differing approaches, federal courts should not be assigning discriminatory intent based on a legislature's facially neutral policy choices.

In another recent example, in *League of Women Voters*, 2022 WL 1435597, at *5, a Florida district court "chide[d] the Supreme Court for suggesting that '[o]ur country has changed' since the Voting Rights Act was enacted in 1965" and held facially neutral voting laws illegal because of, among other things, Florida's Civil War-era problems with racism. *Id.* These attempts by federal

10

courts to conflate policy disagreement with discrimination (often relying on assertions of decades- or centuries-old racism) are both illegal and corrosive of democracy. It cannot be that all policies we disagree with are racist or unconstitutional.

### B.  The district court ascribed racial animus to the Florida Legislature with no justification whatsoever.

The district court here fell prey to this same tendency to turn the plaintiffs' policy preferences into constitutional mandates. Throughout its opinion, the court conflated a political view—that immigration laws should be enforced, or that unlawful immigration is a problem—with racial animus. Indeed, the district court here "never once mentioned the presumption" of good faith, much less "meaningfully accounted for" it. *League of Women Voters*, 2022 WL 1435597, at *5. Instead, the court repeatedly went out of its way to ascribe *bad* faith to the Florida Legislature, legislators, private groups—anyone who happened to be on the other side of disputed questions about immigration. And the district court inferred supposedly discriminatory intent from Florida's purely political, facially neutral decisions.

**1.** Most gallingly, the district court improperly assumed that opposition to unlawful immigration is racially motivated. The district court placed great emphasis on the supposed "rise of the

immigrant 'threat narrative,'"—a political view that, as the district court explained it, associates "'illegal immigrants' with 'lawlessness'" and calls for action as a matter of "public safety." Doc. 201 at 53–54, 79–81. Of course, it is hard to prove or disprove (or even define) something as amorphous as the "immigrant threat narrative." It is the sort of thing cooked up in an ivory tower by a supposed "expert" in "racial animus" and "discriminatory legislative intent," Doc. 201 at 48, not by a court. But even if one could somehow apply this concept as a legal matter, the district court never explained how the Legislature endorsed it or how it was racially motivated.

Instead, the district court systematically conflated opposition to illegal immigration with invidious racial discrimination. Without this conflation, the district court's opinion would be barely a few words long. *See, e.g.*, Doc. 201 at 54 (relying on a "shifting political divide," which included the selection of politicians who "advocated for anti-immigrant policies"); *id.* at 72 (suggesting that because SB 168 was "specifically tied to the undocumented immigrant community," it was discriminatory); *id.* at 80–81 (accusing Senator Gruters of "anti-immigrant views" because he described illegal immigrants as "invaders" and called for the federal government to "lock down" the border) (quoting

Doc. 191-1 at 132); *id.* at 82 (referencing the "growing … trend" of "proactive policing measures" based on the belief that "undocumented immigrants were violent criminals who posed a threat to the safety of society"); *id.* at 89 (faulting Florida legislators for attending a "press conference titled 'Victims of Illegal Immigration Day'"); *id.* at 91, 93 (suggesting that using the term "illegals" is racist). The district court even accused Governor DeSantis of discriminatory behavior because he campaigned on an "anti-immigrant platform"—but all this meant was that Governor DeSantis argued that "incentivizing illegal immigration … is unfair to our legal immigrants, promotes lawlessness, and reduces wages for our blue-collar workers." *Id.* at 22, 81. Wise or unwise, that is not *racially discriminatory*.[1]

This Court should emphatically reject the district court's attempt to tar legitimate political positions as inherently suspect. There is nothing discriminatory about opposing illegal immigration, let alone supporting enforcement of the federal

---

[1] Reinforcing the district court's incoherent theory of discrimination is that the court faulted Governor DeSantis for opposing sanctuary cities in his campaign. Doc. 201 at 81. In other words, the district court identified opposition to sanctuary cities as necessarily driven by animus. No wonder then, that the district court held that an anti-sanctuary-cities law was motivated by animus.

government's *current* immigration laws. Such policies might or might not be prudent, but for a federal court to declare that enforcing them is *out of bounds* under the Constitution is extraordinary—and extraordinarily wrong.

If political opposition to unlawful immigration (or even immigration generally) were unconstitutional, "any generally applicable immigration policy could be challenged on equal protection grounds." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020). Reasonable people debate the costs and benefits of immigration, particularly unlawful immigration, all the time. That debate can be partisan, "but partisan motives are not the same as racial motives." *Brnovich*, 141 S. Ct. at 2349. Policy preferences are not constitutional mandates, yet the district court did not so much as *try* to explain how anti-immigration views are inherently suspect under the Constitution.

Rather, the district court blatantly "substitute[ed] its judgment for that of the legislature." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469 (1981). The court dismissed "facially valid" interests, such as public safety, as "unsupported by any research or data." Doc. 201 at 96. But legislatures *do not need to provide* any such justification. Legislatures have no

14

requirement "to articulate [their] reasons for enacting a statute." *Beach Commc'ns*, 508 U.S. at 315. Nor does it matter whether SB 168 will, for example, improve or worsen crime rates in Florida. *Contra, e.g.*, Doc. 201 at 52–53, 55, 81, 96. Federal courts cannot invalidate laws on the ground they are "improvident," unwise, or counterproductive. *Vance*, 440 U.S. at 97. *See also, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194 (2008) (upholding Indiana voter-ID law even though the "record contain[ed] no evidence of [voter impersonation] fraud actually occurring in Indiana at any time").

And although it should not matter—Florida need not affirmatively prove its good faith—the district court simply ignored the many reasons states and voters may have for their immigration preferences. To cite just one example: states "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397; *see also Demore v. Kim*, 538 U.S. 510, 518 (2003) (detailing Congress's efforts to "deal with increasing rates of criminal activity by [deportable] aliens"). The *amici* States spend tens of millions of dollars per year on education, medical care, welfare programs, and criminal justice programs for unlawful immigrants. *See* Jason Richwine & Robert Rector, *The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer* at

Chart 5, The Heritage Foundation (May 6, 2013), https://www.heritage.org/immigration/report/the-fiscal-cost-unlawful-immigrants-and-amnesty-the-us-taxpayer (estimating that unlawful immigrant households received twice as much in government benefits as they paid in taxes); *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*, Congressional Budget Office (December 2007), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf (collecting studies confirming similar findings). The Constitution does not declare that the *amici* States must ignore those costs, and it does not require that the Florida Legislature must ignore them either.

**2.** Even outside its mistaken view that only racists oppose unlawful immigration, the district court time and again faulted Florida for purely political, race-neutral actions. To highlight one particularly egregious example: the district court reasoned that the Legislature must have acted with discriminatory intent because it rejected an amendment to SB 168 that would have required "every law enforcement officer to complete eight hours of training on implicit biases." Doc. 201 at 100. But that is preposterous. Florida could have *many* good reasons for rejecting "implicit bias" training, ranging from rejecting its efficacy to

believing that such "training" is affirmatively harmful. *See* Tiffany L. Green, *The Problem with Implicit Bias Training*, Scientific America (August 28, 2020), https://www.scientificamerican.com/ article/the-problem-with-implicit-bias-training/ (explaining there is little evidence that the training "leads to meaningful changes in behavior"); Dyin Atewologun, et al, *Unconscious Bias Training: An Assessment of the Evidence for Effectiveness*, Equality and Human Rights Commission (March 2018), https://www.equality humanrights.com/sites/default/files/research-report-113-unconcious-bais-training-an-assessment-of-the-evidence-for-effectiveness-pdf.pdf (finding that implicit bias training can "backfire").

The district court also suggested that it was suspicious the Legislature rejected an amendment that would have limited SB 168's application to felons, or created other exemptions to the law's reach. Doc. 201 at 100–01. That is, the district court *assumed* something was wrong with SB 168 and so held that Florida's decision not to *limit* the reach of SB 168 was somehow suspect. This sort of tautological reasoning would not succeed anywhere, but it is especially pernicious where the court should have *presumed* good faith. Florida did not need to narrowly tailor

17

a facially neutral law that seeks merely to enforce federal immigration law.

And that is on top of the basic point that legislative "inaction" is a "particularly dangerous ground" from which to derive meaning. *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Amendments, like bills, "can be proposed for any number of reasons, and … can be rejected for just as many others." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001). "Failed amendments" thus "tell us 'little' about what a statute means." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 569 n. 5 (2015) (Alito, J., dissenting) (quoting C*ent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)). The district court ignored this point, too.

The district court also placed great weight on historical evidence of supposedly discriminatory policing in Florida, despite the Supreme Court's clear direction that "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (citation omitted). Historical analysis should be limited to "the specific sequence of events leading to the *challenged decision*," not past discrimination *generally*. *Vill. of Arlington Heights*, 429 U.S.

at 267 (emphasis added). It should always be a red flag when a court seeks to rely on distant history—sometimes reaching back to the civil war—to invalidate modern-day laws. *See Hobbs*, 948 F.3d at 1017 ("Arizona's history of discrimination dates back to 1848."); *League of Women Voters*, 2022 WL 1435597, at *5 ("[The district court] began its survey of that history beginning immediately after the Civil War.").

Despite paying lip service to these principles, the district court spent pages reviewing the "historical pattern of discrimination and racial profiling by law enforcement in Florida." Doc. 201 at 78. That evidence (which, in this case, is itself tenuous and based on a number of non sequiturs) is barely relevant, if relevant at all. Supposed historical discrimination by Florida law enforcement officers offers virtually no insight into whether Florida's legislators passed *SB 168* with discriminatory intent— especially when the law *prohibits* discrimination. The district court's theory seems to have been that law enforcement disparately impacts minorities, so any expansion of law enforcement must be racially motivated and unconstitutional. That cannot be right, and it is not.

### III. Courts cannot impute ill-intent to a legislature based on minimal connections between a few legislators and (supposedly) racially motivated private parties.

All agree that "SB 168 is neutral on its face." Doc. 201 at 62. The district court nevertheless held the Florida Legislature intentionally discriminated in enacting it, based on a Rube-Goldberg-style connection between the Legislature and some advocacy groups. In the district court's view, SB 168's sponsors interacted with two advocacy organizations that supposedly harbor racist views. *Id.* at 84–89. In turn, the district court determined that the legislative sponsors must also have held these views. *Id.* at 89–92. And *that*, in turn, supposedly "suggest[ed] that the Legislature ratified the racially discriminatory views." *Id.* at 84. But this line of reasoning is obviously wrong—indeed, the Supreme Court *specifically rejected* the district court's theory of legislative intent less than a year ago. *See Brnovich*, 141 S. Ct. at 2350.

"[D]etermining the intent of the legislature" by relying on the "statements of one legislator" is always "problematic." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021) (citing *Hunter*, 471 U.S. at 228). When considered, legislative history "has a tendency to become … an exercise in 'looking over a crowd and picking out your friends.'"

20

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (citation omitted). That is why, generally, legislative intent is determined by "start[ing] with the text" of the legislation itself, *Gamble*, 139 S. Ct. at 1965, not "extra-textual evidence," *Trump v. Hawaii*, 138 S. Ct. 2392, 2412 (2018).

Rather than heed the clear legal principles in this area, the district court again went out of its way to fault Florida. The district court spent pages discussing how Senator Gruters and Representative Byrd, SB 168's two sponsors, communicated and received data from Floridians for Immigration Enforcement (FLIMEN) and the Federation for American Immigration Reform (FAIR). *See* Doc. 201 at 84–87. The court found it meaningful that SB 168's two sponsors held a press conference to highlight the victims of illegal immigration at FLIMEN's urging. *Id.* at 89–90. According to the district court, that press conference—where family members of a man murdered by an illegal immigrant spoke and where others provided data about the connection between illegal immigration and crime—somehow "highlight[ed] the racial animus of FLIMEN and other related groups." *Id.* at 91.

In the district court's view, because these two legislators communicated and appeared publicly with groups that opposed illegal immigration (and were therefore "racist and xenophobic"),

the entire Florida legislature must have "ratified … racially discriminatory views." *Id.* at 84. The district court even suggested that the legislature had the burden of proving that SB 168 was "untainted" by the "racist, anti-immigrant views" of FAIR and FLIMEN. *Id.* at 89. This is all nonsense.

To start, in *Brnovich*, the Supreme Court specifically rejected the idea that discriminatory motives of lobbyists or even a bill's sponsor can taint the entire legislative body. 141 S. Ct. at 2350. "[T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Id.* "[L]egislators have a duty to exercise their judgment and to represent their constituents. … It is insulting to suggest that they are mere dupes or tools." *Id.*

That FAIR and FLIMEN were involved with the passage of SB 168 is unremarkable. Advocacy groups help legislators craft legislation all the time. Their assistance does not mean that individual legislators, much less the entire legislature, share their beliefs or motives. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1083 n.15 (10th Cir. 2018) ("[I]n discerning legislative intent we look not to the motive of advocacy groups, lobbyists, or even individual legislators, but the legislature as a whole."); *Van Straaten v. Shell Oil Prods. Co.*, 678 F.3d 486, 489 (7th Cir. 2012) ("[W]hat lobbyists told [legislative] staff is not legislative

22

history."); *Main v. Office Depot, Inc.*, 914 F. Supp. 1413, 1417 (S.D. Miss. 1996) (same). Courts may not penalize legislatures "because of who they were [and who they associated with], instead of what they did." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 304 (4th Cir. 2020).

Even if Senator Gruters and Representative Byrd *did* share FLIMEN's and FAIR's motives (and further assuming that those motives were discriminatory), that offers no insight into the rest of the legislature's intention in passing SB 168. *Brnovich* rejected the argument that "racially-tinged" allegations of voter fraud by one legislator "imbued" the "legislature as a whole … with racist motives." *Brnovich*, 141 S. Ct. at 2349–50. And this Court, too, has consistently rejected attempts to impute statements by a single legislator to the entire body. *See League of Women Voters*, 2022 WL 1435597, at *5 (A "statement by a single legislator is not fairly read to demonstrate discriminatory intent by the state legislature."); *Greater Birmingham Ministries*, 992 F.3d at 1324 (expressing "skepticism that … discriminatory intent could be ascertained from the statements of one legislator speaking about another bill").

The Supreme Court has instructed federal courts to give "little weight" to "the statements of legislative opponents"

attacking a bill. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 n.24 (1976). But here, the district court simply adopted all of the hyperbole that opponents of SB 168 had to offer. That was wrong, and this Court should declare as much in no uncertain terms.

## CONCLUSION

The judgment of the District Court should be reversed.

Respectfully submitted.

/s/ *Edmund G. LaCour Jr.*
Steve Marshall
  *Attorney General of Alabama*
Edmund G. LaCour Jr.
  *Solicitor General*
  A. Reid Harris
    *Assistant Attorney General*
Office of the Alabama
  Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@alabamaag.gov

/s/ *Stephen J. Petrany*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Drew F. Waldbeser
  *Deputy Solicitor General*
Hannah N. Basta
  *Assistant Attorney General*
Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

Treg R. Taylor
  *Attorney General of Alaska*

Mark Brnovich
  *Attorney General of Arizona*

Leslie Rutledge
  *Attorney General of Arkansas*

Theodore E. Rokita
  *Attorney General of Indiana*

Derek Schmidt
  *Attorney General of Kansas*

Daniel Cameron
  *Attorney General of Kentucky*

24

Lynn Fitch
   *Attorney General of Mississippi*

Eric Schmitt
   *Attorney General of Missouri*

Austin Knudsen
   *Attorney General of Montana*

Doug Peterson
   *Attorney General of Nebraska*

John M. O'Connor
   *Attorney General of Oklahoma*

Alan Wilson
   *Attorney General of South Carolina*

Ken Paxton
   *Attorney General of Texas*

Sean D. Reyes
   *Attorney General of Utah*

Patrick Morrisey
   *Attorney General of West Virginia*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 4,723 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2022, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Stephen J. Petrany*
Stephen J. Petrany