[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13657

_____

CITY OF SOUTH MIAMI,

Plaintiff-Appellee,

FLORIDA IMMIGRANT COALITION, INC.,
FARMWORKER ASSOCIATION OF FLORIDA, INC.,
FAMILY ACTION NETWORK MOVEMENT, INC.,
QLATINX,
WECOUNT!, INC., et al.,

Plaintiffs-Appellees,

PHILLIP K. STODDARD,

Plaintiff,

*versus*

GOVERNOR OF THE STATE OF FLORIDA,
ATTORNEY GENERAL, STATE OF FLORIDA,

Defendants-Appellants.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-22927-BB

————————————

Before WILLIAM PRYOR, Chief Judge, MARCUS, Circuit Judge, and
MIZELLE,* District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal concerns whether several organizations may sue
the governor and attorney general of Florida in federal court to
challenge a state law that requires local law enforcement to coop-
erate with federal immigration officials. The state law provides that
local officials shall support the enforcement of federal immigration
law and cooperate with federal immigration initiatives and officials
and that local officials may transport aliens subject to an immigra-
tion detainer to federal custody. Several plaintiff organizations sued
the Florida governor and the Florida attorney general to enjoin en-
forcement of the law. The organizations alleged that the provisions
about support and cooperation were adopted with the intent to

————————————

* Honorable Kathryn Kimball Mizelle, United States District Judge for the
Middle District of Florida, sitting by designation.

discriminate based on race and national origin in violation of the Fourteenth Amendment. And they maintained that the transport provision is preempted by federal law. After a bench trial, the district court permanently enjoined the governor and attorney general from enforcing compliance with these provisions.

This controversy is not justiciable because the organizations lack standing. The organizations have not established a cognizable injury and cannot spend their way into standing without an impending threat that the provisions will cause actual harm. Moreover, the organizations' alleged injury is neither traceable to the governor or attorney general nor redressable by a judgment against them because they do not enforce the challenged provisions. Instead, local officials, based on the state law, must comply with federal immigration law. We vacate and remand with instructions to dismiss for lack of jurisdiction.

## I. BACKGROUND

In 2019, the Florida Legislature passed Senate Bill 168, Ch. 2019-102, § 1, Laws of Fla. (codified at FLA. STAT. §§ 908.101–908.109), to advance the state's interest in "cooperat[ing] [with] and assist[ing] the federal government in the enforcement of federal immigration laws within th[e] state." *Id.* § 908.101. Among other things, S.B. 168 prohibits so-called "sanctuary policies" by requiring local law enforcement to assist federal authorities in enforcing federal immigration law.

This appeal involves three provisions of S.B. 168. First, the best-efforts provision, *id.* § 908.104(1), states that law enforcement must "use best efforts to support the enforcement of federal immigration law." Second, the sanctuary provision forbids state and local entities from adopting any "sanctuary policy." *Id.* § 908.103. The statute defines a "sanctuary policy" as "a law, policy, practice, procedure, or custom . . . which prohibits or impedes a law enforcement agency from complying with" certain federal initiatives and from cooperating with federal immigration officials regarding access to prisoners and detainers. *Id.* § 908.102(6). And third, the transport provision authorizes law enforcement officers to "securely transport" an alien who is in their custody and "subject to an immigration detainer" to a federal facility. *Id.* § 908.104(4).

Two other provisions of S.B. 168 are relevant. The statute contains an explicit anti-discrimination provision that bars officers from basing "actions under this chapter on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution." *Id.* § 908.109. It also permits the governor and attorney general to sue state and local officers to enjoin violations of the statute. *Id.* § 908.107(1), (2).

Shortly after S.B. 168's passage, a group of plaintiffs—including a coalition of non-profit organizations devoted to immigrant rights—sued to enjoin the governor and attorney general from enforcing S.B. 168. The organizational plaintiffs alleged that the best-efforts requirement and the sanctuary provision were

unconstitutional because they violated the Equal Protection Clause. U.S. CONST. amend. XIV, § 1. The organizations argued that these provisions, although neutral on their face, were enacted with purposeful discriminatory intent. The organizations maintained that these provisions would have a disparate impact on their members because local law enforcement would profile racial minorities while enforcing federal law. The organizations also alleged that the transport provision was preempted by federal law.

When the organizational plaintiffs moved for a preliminary injunction, the district court ruled that the organizations had established standing to mount an equal-protection challenge on their own behalf and on behalf of their members. With respect to organizational standing, the district court concluded that the organizations had sufficiently alleged that they diverted resources "to address member concerns about the law and its implications." For instance, the organizations operated a toll-free hotline to address member concerns, hosted community meetings, and conducted "Know Your Rights" presentations. With respect to associational standing, the district court found that the organizations sufficiently alleged that "S.B. 168 has, and will continue to, injure their individual members." Specifically, the district court credited the organizations' claim that their members would suffer harm "from racial and ethnic profiling, and unlawfully prolonged stops, arrests, and detentions on suspicion of civil immigration violations." The district court also found that the members would suffer harm because the enforcement of S.B. 168 would "discourage [them] from accessing

essential . . . services, . . . enforcing their legal rights, . . . and apply-
ing to and enrolling in public schools." For similar reasons, the dis-
trict court ruled that the organizations had standing to challenge
the transport provision. The district court ruled that the organiza-
tions established associational standing because they alleged that
their members faced a threat of "unlawful detention, transporta-
tion, and enforcement under S.B. 168." And the district court con-
cluded that the organizations had organizational standing because
they had to divert resources "away from core activities in order to
respond to member inquiries about S.B. 168's enactment, implica-
tions, and enforcement." The district court granted a preliminary
injunction with respect to the transport provision on the ground
that it was likely preempted but denied the motion with respect to
the remaining provisions.

The parties filed competing motions for summary judg-
ment. After reviewing the factors set forth in *Village of Arlington
Heights v. Metropolitan Housing Development Corp.*, 429 U.S.
252 (1977), the district court denied summary judgment on the or-
ganizations' equal-protection claims. But the district court ruled
that the transport provision was unconstitutional because it was
preempted by federal law and granted summary judgment in favor
of the organizational plaintiffs on their preemption claim. It made
permanent the injunction against enforcement of the transport
provision.

The case proceeded to a bench trial on the equal-protection
claims. After trial, the district court issued an opinion in which it

ruled that the organizations had proved Article III standing for the same reasons it had cited in its earlier order. That is, the organizations had to, and would continue to, "divert . . . limited resources away from their core activities" and the members would "suffer[] injuries relating to S.B. 168's illegal enforcement and its chilling effect on immigrants' willingness to access essential services." And the district court ruled that S.B. 168's best-efforts provision and sanctuary provisions violated the Equal Protection Clause because they resulted in a racially disparate impact and were enacted with discriminatory intent. Though the district court never addressed whether the governor and attorney general were proper defendants, the district court permanently enjoined the governor and attorney general from enforcing these provisions.

## II. STANDARD OF REVIEW

We review issues of subject-matter jurisdiction *de novo*. *Brown v. Snow*, 440 F.3d 1259, 1262 (11th Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

## III. DISCUSSION

This Court has "an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). Under Article III of the Constitution, our jurisdiction encompasses only "Cases" and "Controversies." U.S. CONST. art. III, § 2. "To have a case or controversy, a litigant must establish

that he has standing, which requires proof of three elements." *Jacobson*, 974 F.3d at 1245 (internal quotation marks and citation omitted). "The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id.* When, as here, "plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). The organizational plaintiffs failed to prove any of the three elements of standing.

### A. The Organizations Did Not Prove an Injury in Fact.

An organization cannot sue without proof of an actual injury. That is, the organizations must establish that they have already been harmed by, or face "certainly impending" harm from, S.B. 168. *Clapper*, 568 U.S. at 401. An organization can establish Article III standing either "through its members [or] . . . through its own injury in fact." *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022).

The organizations assert that they established both types of standing. First, the organizations maintain that their members have suffered, and will continue to suffer, racial profiling by law enforcement complying with S.B. 168. Second, the organizations assert that they have diverted resources from existing programs to respond to S.B. 168. Neither theory holds water.

### 1. The Organizations Do Not Have Standing Based on Their Members' Alleged Injuries.

The organizations lack standing based on their members' alleged injuries. "To establish associational standing, an organization must prove that its members would otherwise have standing to sue in their own right." *Jacobson*, 974 F.3d at 1249 (internal quotation marks and citation omitted). All agree that racial profiling qualifies as an injury in fact. But the organizations have not established that their members face present harm or a "certainly impending" threat of racial profiling as a result of S.B. 168. *Clapper*, 568 U.S. at 410.

The organizations' alleged harm "rests on their highly speculative fear," *id.*, that: the federal government will target their members for deportation; the federal government will enlist the help of local authorities, even though street-level cooperation with federal officials is exceedingly rare; local officials will invoke their authority under S.B. 168 to justify cooperation; local authorities will successfully target the organizations' members; and local authorities, following federal directives, will racially profile the organizations' members in the process despite S.B. 168's explicit ban on discrimination. This "highly attenuated chain of possibilities," *id.*— which "rest[s] on speculation about the decisions of independent actors," *id.* at 414 (noting the Supreme Court's reluctance to endorse such standing theories)—"does not satisfy the requirement that threatened injury must be certainly impending," *id.* at 410. It is, if anything, improbable.

The organizations resist this conclusion. They argue that their members "have suffered injuries from racial and ethnic profiling, unlawful or unfounded traffic stops, and illegal detentions by law enforcement agencies that are attempting to comply with the requirements of S.B. 168." The organizations maintain that this evidence "show[s] that [their] members have been and will be direct targets of S.B. 168."

We disagree. Forty years ago, the Supreme Court made clear that past occurrences of unlawful conduct do not establish standing to enjoin the threat of future unlawful conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The members' generic allegations of *previous* racial profiling by Florida law enforcement do not prove that any future injury is imminent.

The organizations try to solve their imminence problem by alleging actual present harm under S.B. 168. That is, they argue that their members have already been profiled because of the new law. But their proof is lacking.

The record does not establish that S.B. 168 caused their alleged profiling. For example, one witness conceded on cross-examination that the alleged profiling occurred before S.B. 168's effective date. Another member acknowledged that she did not know why a stop occurred. As in *Clapper*, the members can "only speculate" that the alleged profiling occurred because of S.B. 168. 568 U.S. at 412–13. Instead of suing immediately to enjoin enforcement of S.B. 168, the organizations would have been better off waiting for concrete evidence that the enforcement of S.B. 168 would lead

to profiling. In this sense, their challenge is not ripe for judgment. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Even if the organizations could prove that local officers profiled their members, they have not proved that the officers acted based on S.B. 168.

The organizations also argue that their members have suffered present harm because the members have refused "essential health, social, and government services" to avoid racial profiling under S.B. 168. But *Clapper* forecloses this theory. "Where a 'hypothetical future harm' is not 'certainly impending,' plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves.'" *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Clapper*, 568 U.S. at 416). And we have rejected the argument that plaintiffs have standing based on their "subjective fear of . . . harm" and its "chilling effect." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1238–39 (11th Cir. 2019). Because the members' feared racial profiling is not "certainly impending," their self-imposed harms do not create a cognizable injury sufficient to support Article III standing.

*2. The Organizations Do Not Have Standing in Their Own Right.*

The organizations also have not proved that they suffered an Article III injury "in their own right." *Jacobson*, 974 F.3d at 1249. To establish standing, an organization, like an individual, must prove that it either suffers actual present harm or faces a threat of imminent harm. *Clapper*, 568 U.S. at 409. An organization suffers actual harm "if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization

to divert resources to counteract those illegal acts." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008). In *Browning*, for instance, the NAACP had standing to challenge a new voting requirement because the NAACP "reasonably anticipate[d]" it would need to "divert personnel and time" from other projects "to educating . . . voters on compliance with" the requirement. *Id.* at 1165–66; *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009). This Court recognized that because the NAACP does not have "limitless resources," its diversion of resources away from "registration drives and election-day . . . monitoring" and in favor of voter education about the new law was a "concrete injury" for purposes of Article III standing. *Browning*, 522 F.3d at 1165–66.

Although an organization can establish standing under a diversion-of-resources theory, it cannot do so by inflicting harm on itself to address its members' "fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. To prove injury in fact based on an organization's diversion of resources to protect individuals from harm, the organizational plaintiff must prove *both* that it has diverted its resources *and* that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion. As our sister circuit has explained, "an organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Shelby Advocs.*

*for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020). The harm must be concrete and imminent.

Our precedent is instructive. In each of the cases in which this Court has found standing based on a resource-diversion theory, the organizations pointed to a concrete harm to an identifiable community, not speculative fears of future harm. In *Browning*, the organizations helped black voters comply with new voting rules that went into effect before an election. Those rules applied to all voters, "forcing" the organizations to divert resources to educate these voters before the election. *Browning*, 522 F.3d at 1165. Similarly, in *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012), illegal immigrants faced a "credible threat of detention" under a new immigration law. *Id.* at 1258. So the law "forc[ed]" the organizations to divert resources to protect illegal immigrants from this imminent harm. *Id.* at 1260. In sum, to establish an injury based on resource diversion, an organization must "present . . . concrete evidence to substantiate [its] fears," not commit resources based on "mere conjecture about possible governmental actions." *Clapper*, 568 U.S. at 420.

Our sister circuits agree that to establish standing, an organization must prove both a diversion of resources and a cognizable injury to an identifiable community that is closely tied to the diversion. In *Equal Rights Center v. Post Properties, Inc.*, the District of Columbia Circuit rejected an argument that standing based on a diversion of resources depends solely on whether the diversion was voluntary. 633 F.3d 1136, 1140 (D.C. Cir. 2011). Instead, our sister

circuit explained that to determine whether there was a concrete injury the district court needed to consider two things: "first, whether [the defendant's] alleged discriminatory conduct injured the [plaintiff organization's] interest in promoting fair housing and, second, whether the [plaintiff organization] used its resources to counteract that harm." *Id.* It held that because the organization failed to prove an injury from the law's actual application to the community the organization sought to support, any diversion was a "self-inflicted" injury that could not support standing. *Id.* at 1142.

The Third Circuit has also held that the diversion of resources, standing alone, does not suffice to establish standing. In *Fair Housing Council v. Montgomery Newspapers*, the plaintiff took issue with a purportedly discriminatory newspaper advertisement and alleged that it would need to divert resources to counteract the discriminatory impact of the advertisement through an education program. 141 F.3d 71, 77 (3d Cir. 1998). The court determined that the plaintiff could not establish standing because it failed to prove any member of the public was denied housing or deterred from seeking housing because of the advertisement. *Id.* In essence, the organization failed to prove the education was necessary to address an actual, non-speculative harm caused by the advertisement. *Id.* As in *Equal Rights Center*, the organization lacked standing because it failed to prove a cognizable injury to the community it sought to protect. In similar fashion, the Fifth Circuit has held that an organization cannot establish standing based on diversion of resources when it diverted resources "due to fear" of the

challenged activity instead of "any concern over the impacts of" the activity itself. *El Paso Cnty v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020).

Although the organizations diverted resources, they failed to produce concrete evidence that S.B. 168 is an imminent threat to their members or the immigrant community. The record is rife with speculative fears of future harm. But the record fails to establish that local officers profiled anyone based on S.B. 168. *Cf. Lyons*, 461 U.S. at 102 ("Past wrongs [are] evidence bearing on whether there is a real and immediate threat of repeated injury." (internal quotation marks and citation omitted)). And the threat of enforcement is not imminent because it rests on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410; *cf. Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1258 (immigrants faced a "credible threat of detention"). At best, the organizational plaintiffs have diverted resources to address "fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *El Paso Cnty.*, 982 F.3d at 344.

In the same way that the members could not "manufacture standing," *Clapper*, 568 U.S. at 402, by inflicting harm on themselves based on "highly speculative" fears, *id.* at 410, neither can the organizations do so. The organizations' commitment of resources amounts to a self-imposed injury "based on speculative fears of future harm." *Shelby Advocs.*, 947 F.3d at 982; *see also Equal Rts. Ctr.*, 633 F.3d at 1142. Speculative harms are no more

cognizable dressed up as an organizational injury than as an associational one.

### B. The Organizations Failed to Prove that Their Alleged Injuries Are Traceable to Or Redressable by Relief Against the Florida Governor or Attorney General.

It should come as no surprise, in a case that so profoundly fails to establish an injury in fact based on highly speculative harm, that traceability and redressability are also lacking. Indeed, it is hard to imagine a circumstance where a plaintiff who could not establish that he has suffered a legally cognizable injury in fact could nevertheless prove that an insufficient injury was traceable to a defendant. This case is no exception.

The organizations' alleged injuries are neither traceable to the Florida governor or attorney general nor redressable by an injunction against these officials. To establish Article III standing, the plaintiff "must show a 'causal connection' between [its] injury and the challenged action of the defendant . . . , as opposed to the action of an absent third party." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Similarly, "the plaintiff must show that it is likely, not merely speculative, that a favorable judgment will redress [its] injury." *Id.* The named state officials meet neither of these criteria. The organizations' grievance lies with absent third parties.

The organizations maintain that S.B. 168 will injure their members because it will "lead to the erosion of trust in law enforcement . . . [and] racial profiling." In other words, the organizations say that officers will target their members—consciously or unconsciously—based on their ethnicity. But this argument misses the real issue.

When traceability and redressability are at stake, the key questions are who caused the injury and how it can be remedied. *See Jacobson*, 974 F.3d at 1253–54 (holding that there was no standing where the alleged injury was not caused by the defendants and the effect of the court's judgment on the defendant would not redress the injury). To answer those questions, we begin with the statute itself. And then we evaluate the organizations' evidence in the light of the statute.

The disputed provisions of S.B. 168 regulate local law enforcement officers and governments. For example, the sanctuary provision requires cities and municipalities to give federal officials access to detainees in their custody. FLA. STAT. §§ 908.102(6), 908.103. It operates on officials at the local level. In similar fashion, the best-efforts provision and transport provision demand cooperation with federal officials from local authorities. The state law requires local law enforcement officials to use their "best efforts" to comply with federal immigration law. *Id.* § 908.104(1). It applies to officials who are "acting within the scope of [their] official duties" as "official[s] . . . of the entity or agency." *Id.* And it permits "law enforcement agenc[ies]," namely "county correctional facilit[ies],"

to transport detainees into federal custody after receiving federal detainers. *Id.* § 908.104(4). In sum, the disputed provisions give local officials the authority to detain and transport illegal aliens. Neither the governor nor the attorney general acts under S.B. 168 in such a way that the organizations' injury is traceable to them or redressable by enjoining them.

The district court's findings make clear that any injury stems from local law enforcement. The district court admitted expert testimony about how people of different races interact with law enforcement. Based on that testimony, the district court found that "proactive policing measures, like the one[s] at issue here" lead to racial profiling due to the "differential views, whether conscious or not, that police have regarding the likely criminality of non-white persons." The district court then found that local officials, with "expansive discretion on when and how to use their 'best efforts,'" would discriminate based on race while enforcing S.B. 168. The district court cited evidence that the organizations "receive[d] reports of racial profiling in encounters with law enforcement," "noticed increased law enforcement presence," "saw an increase in callers . . . who feared going to law enforcement," and "raised concerns relating to the scope of law enforcement agencies' responsibilities." These are all harms caused by local law enforcement. The district court itself explained, "Plaintiffs demonstrated that their members have suffered *injuries* from racial and ethnic profiling, unlawful or unfounded traffic stops, and illegal detentions *by law enforcement agencies* that are attempting to comply with [S.B. 168]." (Emphasis

added.) And the organizational plaintiffs agree with this assessment.

The organizations nevertheless insist that their injuries are both traceable to the governor and attorney general and redressable by an injunction against those officials because those officials have sufficient control over local law enforcement. But the organizations failed to produce any evidence at trial to support this claim. Indeed, they have offered nothing to prove that the governor or attorney general has enforced or threatened to enforce S.B. 168, let alone that they have threatened to do so in a racially discriminatory way.

*Lewis* is similar in this respect. In *Lewis*, two workers sued the Alabama attorney general to enjoin a state law that preempted a local minimum-wage ordinance. 944 F.3d at 1293–94. We held that any injury the plaintiff workers suffered from receiving lower wages was not caused by the attorney general because he "had never enforced or threatened to enforce the law[] and the law itself contemplated no role for the attorney general." *Jacobson*, 974 F.3d at 1254 (citing *Lewis*, 944 F.3d at 1296, 1298–99).

On the ground, where it counts, local officials enforce S.B. 168. Local officials commit the alleged profiling. Local officials cooperate with federal officials in enforcing federal immigration law. Local officials transport detainees in their custody into federal custody. As in *Lewis*, the organizations have pointed to no evidence that the governor or attorney general have "enforced or threatened to enforce" S.B. 168 against them or their members. *Id.* (citing

*Lewis*, 944 F.3d at 1296, 1298–99). And the record contains no evidence that an injunction against the governor or the attorney general will curtail or otherwise redress racial profiling by local officials who are not parties to this action. Without this evidence, the organizations have failed to meet their burden as to traceability and redressability.

The organizations offer two arguments that we rejected in *Lewis* and *Jacobson*. First, they maintain that the governor and attorney general have sufficient control over local officials because "S.B. 168 *expressly* authorizes Defendants to enforce S.B. 168 against local officials and governments by filing a lawsuit." But the organizations in *Jacobson* made an identical argument. *Id.* at 1253. There, several voters and organizations sued the Florida Secretary of State to enjoin the enforcement of a law governing the order in which candidates appear on the ballot. *Id.* at 1242. Because he did not control the ballot order, we held that the Secretary of State was not a proper defendant. *Id.* at 1254. Florida law instead "expressly g[ave] a different, independent official control over the order in which candidates appear on the ballot." *Id.* The organizations insisted that the secretary had control over the supervisors of elections because he could "bring actions . . . to enforce the performance of [their] duties." *Id.* (internal quotation marks and citation omitted). We rejected that argument. As we explained, "[t]hat the Secretary must resort to judicial process if the Supervisors fail to perform their duties underscores her lack of authority over them." *Id.* So it is here. The governor and attorney general are limited to

coercive suits and do not "enforce" S.B. 168 against the organizations or their members.

The organizations maintained at oral argument that S.B. 168 is distinguishable from the law in *Jacobson* because it specifically contemplates that the governor will "enforce" the law. To be sure, the governor may sue local officers "to *enforce* compliance" with the disputed provisions. FLA. STAT. § 908.107(1) (emphasis added). But the same was true in *Jacobson*. The Florida Code expressly confers on the secretary the power to "[b]ring and maintain . . . actions at law or in equity . . . to *enforce* the performance of any duties of a county supervisor of elections." FLA. STAT. § 97.012(14) (emphasis added). A statute's use of the magic word "enforce" does not conjure up standing to challenge that law.

Second, the organizations assert that the governor has sufficient control over local officials because S.B. 168 provides that local officials may be "subject to action by the governor in the exercise of his or her authority under the State Constitution and state law." FLA. STAT. § 908.107(1). The organizations speculate that the governor will use this statutory grant of general authority together with his preexisting authority under article IV of the Florida Constitution to suspend local officials who refuse to enforce S.B. 168. *See* FLA. CONST. art. IV, § 7(a). Again, *Lewis* stands in their way.

In *Lewis*, the plaintiffs attempted to establish traceability by pointing to the attorney general's "general authorization" to institute proceedings against local officials "to protect the rights and interests of the state." 944 F.3d at 1300 (citation omitted). But we

ruled that this standing theory "prove[d] entirely too much" because it would make the attorney general "a proper party defendant under innumerable provisions of the Alabama Code." *Id.* The same is true here. As the governor and attorney general argue, if the governor's ability to suspend officials for cause established traceability, then the governor "would be a proper defendant in any challenge to State or local policy."

At oral argument, the organizations attempted to distinguish *Lewis* on the ground that S.B. 168 specifically recognizes the governor's constitutional powers and the challenged provision in *Lewis* did not cite a corresponding constitutional authority. But this distinction is not meaningful. To establish traceability and redressability, the organizations had to prove that the governor's enforcement would cause them injury and that a favorable judgment would "*likely*" redress their injury. *See Lewis*, 944 F.3d at 1296 (emphasis added). Even indulging the *unlikely* assumption that the boilerplate provision in S.B. 168 reminded the governor that he could suspend officials for cause, the organizations still had to prove that the governor's ability to suspend officials for violations of S.B. 168 would contribute to their alleged harm: racial profiling by local officials. They failed to do so.

Local officials have an independent obligation to follow the law. Fla. Stat. § 112.311(6) (local officials "are bound to uphold . . . the State Constitution and to perform efficiently and faithfully their duties under the laws of the . . . state"). So does the governor. *Id.* And S.B. 168 explicitly prohibits discrimination. *Id.* § 908.109. In

this pre-enforcement posture, the record does not establish that it is likely that officers will discriminate based on race under S.B. 168—which would violate the law itself.

The record contains no evidence—*none*—that Governor DeSantis would use his suspension authority to encourage racial profiling. There was no evidence that, for instance, the governor made any statement or in any way suggested that a state or local official ought to use racial profiling in connection with enforcing S.B. 168—a statute that requires race neutrality—or cooperating with federal immigration priorities. Indeed, the organizations offered no evidence that Governor DeSantis said anything about how or under what circumstances he would enforce S.B. 168. If anything, Governor DeSantis would presumably follow the law and seek to curtail the discrimination that S.B. 168 expressly prohibits. So, in the absence of contrary evidence, an injunction against the governor's enforcement of S.B. 168 ironically would harm the organizations because it would inhibit the governor's oversight under the antidiscrimination provision. The provision for gubernatorial enforcement does not establish traceability or redressability.

The organizations' failure to produce any evidence to trace any injury to the governor and attorney general does not foreclose the possibility that these officials could be proper defendants on a different record, as our precedents make clear. For example, in *Georgia Latino Alliance*, the governor and attorney general of Georgia were named defendants in a preenforcement challenge to a state immigration law. 691 F.3d at 1256–57. The plaintiffs argued

that federal law preempted the state law, which "authorize[d] Georgia law enforcement officers to investigate the immigration status of an individual if the officer ha[d] probable cause to believe the individual ha[d] committed another crime and the individual [could not] provide one of the pieces of identification listed in the statute." *Id.* at 1256. The district court entered a preliminary injunction against the state officials. *Id.* at 1257. On appeal, we held, based on the plaintiffs' allegations and declarations, that the state officials had sufficient enforcement authority to establish traceability and redressability because the governor had "sufficient, albeit indirect, contact with the program's enforcement." *See id.* at 1260 n.5.

For that proposition, *Georgia Latino Alliance* relied on *Luckey v. Harris*, a suit against the governor and state judges on behalf of a class of indigent criminal defendants and their attorneys. 860 F.2d 1012, 1013 (11th Cir. 1988). The class alleged "systemic deficiencies" in the provision of indigent criminal defense and sought an injunction requiring state officials to meet "minimum constitutional standards" in the provision of these services. *Id.* The district court dismissed the suit at the pleading stage on the ground that it was "in essence a suit against . . . Georgia and therefore was barred by the eleventh amendment." *Id.* We reversed.

We held that the governor was a proper defendant under *Ex parte Young*, 209 U.S. 123 (1908), because "[a]ccording to the Georgia constitution, the governor is responsible for law enforcement in that state and is charged with executing the laws faithfully" and "[t]he governor further has the residual power to commence

criminal prosecutions and has the final authority to direct the attorney general to 'institute and prosecute' on behalf of the state." *Luckey*, 860 F.2d at 1016 (internal citation omitted). Part of the Governor's prosecutorial role included "furnish[ing] counsel" to indigent defendants. *Id.* We concluded that the class established standing because the class members "alleg[ed] that they [we]re presently being denied constitutional rights as a direct result of the failure of [defendants] to furnish [constitutionally sufficient] counsel." *Id.* That is, they alleged an injury traceable to and redressable by the governor.

Both *Georgia Latino Alliance* and *Luckey* establish that the governor may be a proper defendant to enjoin the enforcement of a state law when the governor has sufficient enforcement power to remedy the plaintiff's alleged harm. In the former, the plaintiffs alleged that they were injured by being subject to a state law that was preempted by federal law. They established that a preliminary injunction redressed that injury because the governor had sufficient contact with the state officers that implemented the law and would presumably mandate its enforcement. *Georgia Latino Alliance*, 691 F.3d at 1256–57. In the latter, the plaintiff class alleged that it was injured because state officials failed to provide it with constitutional protections during criminal prosecutions. *Luckey*, 860 F.2d at 1016. The class alleged that an injunction against the governor would redress that injury, which was a "direct result" of the governor's oversight of state prosecutions and his "failure . . . to furnish [constitutionally sufficient] counsel." *Id.* In both cases, an

injunction against the governor at least partially remedied the plaintiffs' injury because the governor's enforcement power at least partially caused, or threatened to cause, that injury. *See Lujan*, 504 U.S. at 560.

In contrast with *Georgia Latino Alliance* and *Luckey*, this appeal involves a permanent injunction following trial where the organizations failed to present any evidence—as they must—that the governor or attorney general would enforce S.B. 168, or that any enforcement would cause them harm. Unlike both *Georgia Latino Alliance* and *Luckey*, the organizations' case went to trial, where they had the burden to establish each element of standing. The organizations alleged a specific harm and bore the burden to produce evidence tying that alleged harm to the governor or attorney general. They failed to do so. This failure distinguishes our case from *Georgia Latino Alliance* and *Luckey*.

The record lacks any evidence that links the governor or attorney general to racial profiling by local officers under S.B. 168. That absence of proof makes sense because S.B. 168 provides the governor with few, if any, tools to make the judgment calls that might result in racial profiling. Federal officials tell local officials which individuals are subject to a detainer. Federal officials request cooperation. Local officials make the arrests. Local officials transport detainees to federal custody. S.B. 168 does not involve the governor or attorney general in incidents of racial profiling.

Moreover, the organizations will allegedly be harmed in the same manner whether the governor or attorney general are

enjoined or not. "[W]e have held traceability to be lacking if the plaintiff would have been injured in precisely the same way without the defendant's alleged misconduct." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (internal quotation marks and citation omitted). In other words, "a plaintiff lacks standing to sue over a defendant's action if an independent source would have caused him to suffer the same injury." *Id.* at 650–51 (internal quotation marks and citation omitted). In this case, the source of the organization's alleged injury is local law enforcement. There is no "remotely plausible causal chain," *Cordoba v. DIRECTTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019), linking racial profiling by local officials to the governor or attorney general of Florida.

The organizations failed to prove standing. They had to establish a concrete threat of enforcement by the governor or attorney general that would lead to racial profiling. But, as in *Lewis*, they conjured up only a "specter" of enforcement by these officials that is unconnected to the harm that they have suffered. 944 F.3d at 1298.

Because the organizations lack standing, we cannot opine on the merits of this case. *See Ex parte McCardle*, 74 U.S. 506, 514 (1868). But our holding that the organizations lack standing should not be read as suggesting that we agree with the district court on the merits. Indeed, we have grave doubts about the merits, but the district court lacked jurisdiction to rule on them.

## IV. CONCLUSION

We **VACATE** the judgment against the governor and attorney general and **REMAND** with instructions to dismiss for lack of jurisdiction.

Kathryn Kimball Mizelle, District Judge, Concurring:

The majority's opinion correctly holds that the district court lacks jurisdiction. This concurrence addresses a discrete issue with the district court's analysis.

In concluding that the Florida Legislature enacted S.B. 168 with discriminatory intent, the district court relied, in part, on the fact that the committee staff analysis in support of the bill referenced data from the Federation for American Immigration Reform (FAIR) and the Center for Immigration Studies (CIS), organizations labeled as "hate groups" by the plaintiffs' counsel. The district court reasoned that because the bill's sponsor made "no effort to explain why these groups' research on the counties listed was reliable or how their data was untainted by the racist, anti-immigrant views that they espoused," those discriminatory views necessarily infected the entire legislative process.

This reasoning is not only legally flawed—there was no basis to flip the burden of proof to the defendants to show that the data the Legislature cited was trustworthy, rather than requiring the plaintiffs to show that it was *untrustworthy*—but more problematically, it wrongly assumes that objectively verifiable facts and data can be "tainted" solely because of the identity of the speaker.

Unlike subjective statements, which are "based on an individual's perceptions, feelings, or intentions," *see subjective*, *Black's Law Dictionary* (11th ed. 2019), objective statements are "based on externally verifiable phenomena," and are "without bias or

prejudice," *see objective*, *Black's Law Dictionary*, *supra*. Whether a dinner plate should be square or round (or some other shape) might be subject to debate, with each advocate bringing his own subjective views to the table; that a triangle has three sides is true regardless of who says it. Put another way, an objective statement is either true or false, and the speaker's motive in offering it is irrelevant to the statement's veracity.

Turning to the data here, the district court took issue with a report produced by FAIR that defines "sanctuary jurisdiction" and provides a list of jurisdictions that meet the definition. Each entry contains the name of the city, the specific policy that satisfied the definition, and hyperlinks to sources for that determination.

FAIR's definition of a "sanctuary jurisdiction" is, of course, subjective, because it is based on FAIR's perception of what policies and practices constitute such a jurisdiction. The term "sanctuary jurisdiction" is used by all kinds of groups to describe all kinds of local policies affecting immigration. As the committee staff analysis of the bill notes, "organizations use different criteria for making their determinations," making it "difficult to determine how many sanctuary jurisdictions exist" in Florida.

But whether a jurisdiction *meets* FAIR's definition is an objective inquiry. It is either true that a city or county "fail[s] to honor ICE detainers, prohibit[s] their employees from communicating with ICE or CBP, or refus[es] to provide information in response to federal requests," or it is false. Because these determinations are verifiable, they are either accurate or inaccurate. Thus, whether a

particular municipality satisfies that definition is an objective in-quiry.

Of course, one can draw false conclusions from objective statements. For example, one can use improper methods or mis-read data to support a wrong conclusion. *See generally, e.g.*, Thomas Sowell, *Discrimination and Disparities* (2018) (noting this common error). An objective statement can also be offered with a racist motive. But the motive of a speaker cannot undermine or taint the truth of an objective statement. Thus, it was error for the district court to assume that objectively verifiable data could be tainted solely because of the alleged views of the speaker.

This does not end the problem. The district court went fur-ther, imputing the alleged motive of the speaker—FAIR—to the listener, the entire Florida Legislature, simply by virtue of the lis-tener using the speaker's data. This is a fallacy stacked on a fallacy. Repeating the *objective* statement of a speaker indicates nothing about whether the listener adheres to the *subjective* beliefs of the speaker. A listener's use of a fact implies only that the listener be-lieves the fact to be true. Put in evidentiary terms, it makes it nei-ther more nor less likely that the listener agreed with the subjective motives for which the speaker offered the objective statement.

So what, if anything, could the data have proven? The dis-trict court could have made two legitimate findings with respect to the data. First, the court could have found the data simply inaccu-rate. If the Legislature adopted demonstrably false statements in its analysis (for example, that certain cities qualified as "sanctuary

jurisdictions" when they fell outside the proffered definition), that might have been a relevant factor in an *Arlington Heights* analysis. *See generally Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252 (1977). But the record does not support this finding, and the district court discerned no problem with FAIR's conclusions and identified no issues with its method.

Second, the district court could have taken issue with FAIR's definition of sanctuary jurisdiction by showing how certain elements of the definition were in fact pretext for racial bias and thus any data derived from the definition was not reliable. Because it is subjective, FAIR's definition theoretically could be "tainted" by alleged animus. It is possible that, if the Legislature adopted that definition, it also adopted the motivations behind it—though binding precedent cautions against this kind of proof of motive in discriminatory intent cases. *See Thai Meditation Assoc. of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 836 (11th Cir. 2020) (refusing to attribute the bias of some community members to city officials); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) ("Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools."). But the Legislature did not adopt FAIR's definition of sanctuary jurisdiction. Instead, it created its own definition, which differed in several respects from FAIR's. *See* FLA. STAT. § 908.102(6). (While one might think that definitional break severed any imputed animus, the district court ruled that even *consideration* by the Legislature of the

definition and data "strongly suggests the existence of underlying racial animus.") Of course, the district court did not explain how the elements of FAIR's definition were discriminatory or why any of the resulting data was tainted.

Instead of one of these legitimate findings, the district court assumed that the data was suspect solely because of the alleged views of FAIR and CIS. Then, the district court concluded that use of the data was proof of racial animus by the Florida Legislature as a whole. Such ad-hominem reasoning and compounding of attenuated inferences is error. The Florida Legislature is permitted to use objectively verifiable data without being condemned because of who collected the data. *See Arizona v. United States*, 567 U.S. 387, 398 (2012) (the Supreme Court relying on data compiled by CIS without adopting all policy views of CIS). Or put more simply, facts are facts, regardless of who says them.